No. 87-295

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

REBECCA HUNTER, a minor child, by
her Guardian and Grandfather, ALBERT
HUNTER,

Plaintiff and Appellant,

-vs-

MISSOULA COMMUNITY HOSPITAL, CHARLES
E. BELL, M.D. and DANIEL A. HARPER, M.D.,

Defendants and Respondents.

---

APPEAL FROM:   District Court of the Fourth Judicial District,
               In and for the County of Missoula,
               The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Small, Hatch, Doubek & Pyfer; John C. Doubek argued,
                Helena, Montana

        For Respondent:

                Garlington, Lohn & Robinson; Larry E. Riley argued,
                Missoula, Montana

---

Submitted:   January 5, 1988

Decided:   February 10, 1988

Filed:   FEB 1 0 1988

*Ethel M. Harrison*

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

In this medical malpractice case, we hold that there was no genuine issue of material fact where plaintiff failed to produce a medical expert competent to establish by testimony the applicable standard of medical care and a departure from that standard. Therefore, the District Court, Fourth Judicial District, Missoula County, correctly granted a summary judgment in favor of the medical personnel. We also determine that the doctrine of res ipsa loquitur is not applicable to this case.

In so holding, we determine that plaintiff's case does not come within the rule that third party expert testimony is not necessary if a medical defendant's own testimony establishes the standard of care and departure from it.

Rebecca Hunter was one of twins born on June 29, 1979, at Missoula Community Hospital. Her twin brother was delivered naturally, but Rebecca was delivered by caesarian section. Rebecca was premature with a birth weight of 3 pounds 4 ounces, born at 32 weeks. Her attending physician was Dr. Charles Bell, and on the day of her birth, Dr. Bell called in Dr. Daniel Harper, a neonatologist, for consultation. Thereafter, she was under the care of these doctors until her discharge from the hospital.

On the day of her birth, Rebecca was placed in an oxygen hood. Her condition, however, was deteriorating, and it was determined that she had hyaline membrane disease, a lung deficiency resulting from her prematurity. Approximately 30 hours after her birth, Dr. Harper inserted in Rebecca's right nostril a nasal tracheal tube (NT tube), which extended through the external nose to the posterior pharynx past the

vocal cords into the larynx. Dr. Harper testified that the placement of the tube was necessary to "preserve life and function." The external end of the tube was attached by means of an adaptor to the respirator. The mechanical result was that a mixture of air was forced through the NT tube into the lungs of the child to expand the lungs. The pressure was stopped at intervals during which the air was expelled from the child's lungs. The NT tube was 3.0 millimeters in diameter, strong enough to take the pressure and at the same time flexible enough to be inserted as described.

The medical notes of the doctors and nurses indicate that the NT tube was in the child from June 30, 1979 until July 3, 1979, when it was removed. During the period that the tube was present in the child, as shown by the nurses' notes, one of the nurses attempted to reposition the NT tube to relieve pressure on the nasal cartilege. On the day following the removal, July 4, 1979, according to the medical records, there was a brown mucous discharge from the child's right nostril. All the medical evidence agrees that stenosis, or narrowing of the orifice, occurred. One of the nurses noted a questionable necrotic condition.

After the removal of the NT tube, the doctors ordered the insertion of a feeding tube or tubes. These tubes were necessary until the child acquired the sucking reflex. One of the tubes was inserted far enough in the internal organs of the child to take the food past the stomach. Later a tube was utilized to insert food into the stomach itself. The medical records do not show whether these tubes were inserted through the right nostril, the left nostril, or through the mouth, nor do they show the duration of time that the tube or tubes were left inserted in the child. The medical testimony indicates that the feeding tubes were more flexible than the NT tube.

Dr. Harper's deposition testimony with respect to the placement of the NT tube is that the tube exited the right nostril in line with the air passage, and then was taped across the moustache area to the side of the face. A further tape was placed on the tip of the nose, straight up the bridge of the nose to the forehead, so as to present a triangular pattern. Dr. Harper testified that it would be impossible to tape the NT tube in any other way because it would not be long enough. The external end of the NT tube was cut to fit the respirator adaptor.

During the time that the baby was in the hospital, until her discharge in July, 1979, she was frequently visited by her grandfather, grandmother and mother. Each of these witnesses maintained that the NT tube or a tube like it was in the right nostril of the child from June 30 until the date of her discharge and that if more than one tube was used, that in all cases the tube was inserted in the right nostril of the baby. Moreover, they maintained that the NT tube from where it exited the right nostril, was taken directly up over her nose, past the left eye, and taped to her forehead in such manner that the pressure from the tube on the cartilege of the baby's nostril was increased. They contend that this condition prevailed for the entire time that the baby was in the hospital from June 30.

On July 23, Dr. Bell noted that Rebecca had a "stenotic R nares" and brought in one Dr. French, an ear, nose and throat specialist for consultation. It was determined that further treatment would not be undertaken at that time until the child had grown older and stouter, sufficiently able to undertake medical repair. At the time of the deposition (1985), the medical repair had not been undertaken. It is contended that the nose of the child is distorted and that

- 4 -

the right nares is almost, if not completely blocked. The condition may be irreparable.

The allegations of malpractice against the medical personnel, as cited by the appellant in brief are that the initial insertion and the way in which the NT tube was positioned and affixed to the face of the baby was improper, and that it was thereafter improper to insert another tube into the same stenotic right nostril of the baby; and that this subsequent tube or tubes were similarly and improperly affixed and maintained to the face of the baby.

Dr. Harper testified in his deposition that if the NT tube had been affixed to the baby's face as described by the grandparents and mother, such placement of the tube would have been improper. He contended, however, that his practice was to affix the tube in the manner that he described and that the NT tube was not long enough to be affixed in the manner described by the lay witnesses. There is no medical dispute that stenosis of the child's right nostril occurred, and this irrespective of the manner in which the tube was affixed to the face of the child. Dr. Harper also testified that he was aware of two other instances where stenosis had developed from the use of an NT tube, but no further explanation was sought as to the circumstances of those instances.

During the course of discovery in this case, counsel for the medical defendants, by interrogatories, demanded from plaintiff the names of any expert witnesses he intended to call, the subject matter upon which the experts would testify, and a summary of the grounds of each opinion. In response, plaintiff's counsel gave two names of doctors who would testify as experts, but whose testimony eventually failed to materialize. Counsel attempted by various means to locate other such experts but those efforts, though

substantial, have been ineffectual. Counsel for plaintiff has located a plastic surgeon who would testify that the damage to Rebecca's nose is consistent with the placement of tubes described by the lay witnesses, but who would not testify as to a standard of care outside of his field of plastic surgery.

Complaint in this cause in the District Court was filed on December 11, 1984. On December 4, 1986, the district judge entered an order regulating pretrial proceedings, providing that discovery would be closed on January 2, 1987, and that witnesses not identified at that time could not be called at trial. On January 5, 1987, the defendants moved under Rule 56, M.R.Civ.P., for summary judgment in their favor. The motion for summary judgment was amended, and thereafter briefed and on February 17, 1987, the District Court granted an additional three months to plaintiff's counsel in which to secure necessary expert witnesses, and ordered that if counsel failed to secure such witnesses and to inform the court and opposing counsel as to their identities by May 1, 1987, the court would dismiss the complaint. In entering that order, the District Court noted that there were questions of fact, (1) as to how many tubes were involved with respect to the right nares of the plaintiff; (2) for what period of time did the tube or tubes remain in the right nares of the plaintiff; and, (3) whether the NT tube was properly stationed or affixed following its insertion. Nevertheless, the District Court noted that there remained other questions of fact relating to whether proper medical protocol was maintained, whether defendants departed from the recognized standard in their treatment and care of the child, and what precisely constituted the applicable standard of care.

The plaintiff failed to produce the names of his experts by May 1, 1987. On May 5, 1987, the motion for summary judgment was renewed by the medical defendants, and on May 25, 1987, the District Court entered summary judgment dismissing the action of the plaintiff.

On appeal, counsel for the plaintiff maintains that the deposition testimony of Dr. Harper established the proper standard of care with respect to the placement of the NT tube and that the testimony of the lay witnesses is sufficient to create a material issue of fact with respect to whether the proper standard of care had been followed. Moreover, he contends that this case, on its face, is governed by the doctrine of res ipsa loquitur.

In Hill v. Squibb and Sons, E.R. (1979), 181 Mont. 199, 592 P.2d 1383, we noted:

> It is true that in several recent cases we have cited with approval Evans v. Burnhard (1975), 23 Ariz.App. 413, 533 P.2d 721, for the proposition that third party expert testimony is not necessary if a defendant doctor's own testimony establishes the standard of care and departure from it. (Citing cases.) Further, in Thomas v. Merriam (1959), 135 Mont. 121, 337 P.2d 604, we indicated that negligence of a doctor may be shown by his own admissions.. . .

Resort to the foregoing rule, however, is not feasible here. What is missing from Rebecca's case before the District Court is testimony that under the circumstances prevailing, the damage to her nostril would have not occurred if the applicable standard of medical care had been followed by the medical personnel. All of the facts argued for by Rebecca's counsel can be assumed to be true, and yet the biggest question remains: Was the stenosis avoidable by adherence to a proper standard of medical care in this case? The answer to that question is beyond the knowledge of lay

- 7 -

persons. Thus it may be that the position of, the number of, and the duration of the tubes, as observed by Rebecca's lay witnesses, were the causes of the stenosis, and eventual damage. On the other hand, it may be that the position of, number of, and duration of the tubes, as testified to by the medical personnel would in the circumstances here also produce the same conditions. It may further be that the possibility of stenosis is a risk that must be accepted under the applicable standard of medical care if the child's life was to be saved. Lay persons do not know the answers to these questions. It requires experts in the field to tell us and here we have no experts.

Thus, we have before us a case in which, though there are genuine issues of fact between the observations of the lay witnesses as to the method of treatment accorded Rebecca and the treatment reflected by the medical notes and the testimony of the medical personnel, these issues are not yet material issues of fact. They will not become material until, by the testimony of competent medical experts, a standard of proper medical care is established and a departure therefrom, without which the stenosis would not have occurred. In other words, even assuming the testimony of the lay witnesses to be accurate, the test of proximate or legal cause has not been met. In the absence of material facts, the summary judgment was proper. See Montana Deaconess Hospital v. Gratton (1976), 169 Mont. 185, 545 P.2d 670.

In the same manner, the doctrine of res ipsa loquitur is not available here. The doctrine does not apply when there is no evidence to show that the result ordinarily would not have occurred had the defendant exercised due care, or that the result was not to be anticipated. Negaard v. Estate of Feda (1968), 152 Mont. 47, 52, 446 P.2d 436, 439. For the

same reasons that we affirm summary judgment in this case, we must deny the applicability of <u>res</u> <u>ipsa</u> <u>loquitur</u>. See Clark v. Norris (Mont. 1987), 734 P.2d 182, 44 St.Rep. 444.

Affirmed.

_John C. Sheehy_
Justice

We Concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_Fred J. Weber_

_L. C. Gulbrandson_

_William E. Hunt_

_R. C. McDonough_
Justices

- 9 -