No. 88-550

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

LAWRENCE A. CHAPEL,

       Plaintiff and Appellant,

  -vs-

JAMES G. ALLISON,

       Defendant and Respondent.

APPEAL FROM: District Court of the Sixth Judicial District,
In and for the County of Park,
The Honorable Byron L. Robb, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

       Monte Beck argued, Bozeman, Montana

    For Respondent:

       Gary L. Walton argued; and John Davis; Poore, Roth &
Robinson, Butte, Montana

    For Amicus Curiae:

       W. William Leaphart argued, Mt. Trial Lawyers' Assoc.,
Helena, Montana
R. Stephen Browning; Browning, Kaleczyc, Berry & Hoven,
Mt. Hospital Assoc., Helena, Montana
Gerald J. Neely, Mt. Medical Assoc., Billings, Montana

Submitted: October 17, 1989

Decided: January 12, 1990

FILED

Filed:

'90 JUN 12 AM 11 34

ED SMITH, CLERK
MONTANA SUPREME COURT

_____
Clerk

Justice John C. Sheehy delivered the Opinion of the Court.

Lawrence A. Chapel sued Dr. James G. Allison for malpractice in the District Court, Sixth Judicial District, Park County. At the close of Chapel's case in chief, before a jury, the District Court granted Dr. Allison's motion for a directed verdict on the basis that Chapel failed to present sufficient evidence to meet his burden of proof. Chapel appeals the judgment in directed verdict to this Court. We reverse and remand for a new trial under the conditions hereafter set forth.

The sole issue upon which we base our reversal is that the District Court erred by granting Dr. Allison's motion for a directed verdict.

Chapel was injured when he was kicked by a horse on February 18, 1983. He was taken to the emergency room at Livingston Memorial Hospital where he was treated by Dr. James G. Allison. The doctor diagnosed the fracture as "comminuted undisplaced fracture of the infra condylar region of the left tibia" after viewing X-rays. There was an open wound proximal to the tibia. He applied a long leg cast extending from Chapel's mid-thigh down to and including his foot.

Chapel was released from the hospital on February 21, 1983. He was readmitted on February 25, 1983 for treatment of a blood clot which had lodged in his lung. By stipulation of counsel this case does not involve any allegation of negligence of Dr. Allison because of the blood clot.

The cast was removed May 2, 1983. Chapel's leg exhibited a varus deformity (bow-leggedness) which required surgery, a procedure called an "osteotomy," to straighten the bowed leg. This surgery was performed September 19, 1984 in

- 2 -

Billings, Montana, at St. Vincent Hospital by Dr. Richard Snider who removed a piece of bone from Chapel's leg.

## I.

Dr. Allison practices in Livingston, Montana, as a licensed non-board-certified general practice physician (thus legally entitled to treat Chapel's injuries). He treated Chapel at the emergency room of Livingston Memorial Hospital and did not refer Chapel to an orthopedic specialist.

Chapel had been a patient of Dr. Allison's for nearly 20 years, the doctor treating ailments from common illnesses up to and including sprains, fractures, and an initial treatment for a ruptured disc.

Chapel's injury was of the kind which would fall within the area of practice of an orthopedic surgeon. It would also fall within the area of practice of a properly qualified general practitioner who possessed the requisite degree of knowledge and skill for treating his patient, but a general practitioner is not trained, excluding experience, at a level a board-certified orthopedic surgeon would be trained. Dr. Allison did not hold himself out to Chapel to be anything other than a general practitioner when he undertook the treatment of Chapel. Dr. Allison claimed during the litigation that he possessed the requisite degree of knowledge for treating Chapel because of his 24 years of practice in which he had treated 1,000 fractures, 50 of which involved the tibia and 15 of which involved the tibial plateau, and one instance of the same injury, but without the wound overlying the fracture site.

The expert testimony produced by the plaintiff Chapel came from an orthopedic surgeon from Denman, Massachusetts, Dr. Stephen Sand, board-certified in the speciality of orthopedic surgery. His testimony was as follows:

Q. Based upon what you have learned by reviewing all of the documents that we mentioned, have you been able to form a reasonable judgment on what the standards of care are in the Livingston-Bozeman area in Montana for the care and treatment of an injury such as was sustained by Mr. Chapel by a general practitioner?

. . .

A. My opinion, based on the review of the information that you have stated, and my contact with a general practitioner in the area, is that a general practitioner would not, under ordinary circumstances, handle this type of case or injury.

After testimony was admitted, the court allowed extensive voir dire examination by opposing counsel of Dr. Sand and upheld the propriety of his opinion over objection.

At the close of Chapel's case in chief, counsel for Dr. Allison moved for a directed verdict on the issue of liability, contending that Chapel had failed to sustain his burden by a preponderance of the evidence that any problems with his leg resulted from the negligence of Dr. Allison. The court granted the motion for a directed verdict.

Later, in dismissing the jury, the District Court stated reasons for the directed verdict. The District Court said that proof of the competency of Dr. Sand to testify in the matter was "very shaky;" that the plaintiff did not call Dr. Kurtz, a Bozeman doctor, upon whom Dr. Sand had relied for information as to the area of practice for a general practitioner; that Dr. Allison had testified that in his opinion Chapel was bow-legged before the accident and despite the leg injury and disc surgery the same year, that Chapel was able to go elk hunting in the mountains for a two-week period; that the other doctors whose testimony appeared in the case have all in effect said that there was no fault [which came from depositions not used at the trial]; that the

reports of the radiologist showed no displacement of Chapel's bones in the X-rays; that the plaintiff had failed to rebut Dr. Allison's testimony that plates, screws and bolts should not be used in an open fracture treatment because of possible risk of infection, or Dr. Allison's testimony that it would be improper to insert a needle or orthoscopic instrument in Chapel's knee; or that general anesthesia was not used and should not be used; that Dr. Allison further testified that further manipulation of the bones might have done more possible harm than good, and other elements of the testimony. In effect, the District Court weighed the testimony as opposed to the evidence of Dr. Sand that "a general practitioner would not under ordinary circumstances handle this type of case or injury."

This court stated in Britton v. Farmers Insurance Group (1986), 221 Mont. 67, 721 P.2d 303, 317, the following:

> A motion for directed verdict is properly granted only in the complete absence of any evidence to warrant submission to the jury, and all inferences of fact must be considered in the light most favorable to the opposing party. Jacques v. Montana National Guard (1982), 199 Mont. 493, 649 P.2d 1319; if the evidence viewed in a light most favorable to plaintiff indicates reasonable men might differ as to the conclusions drawn from the evidence, a directed verdict is not proper. Weber v. Blue Cross of Montana (1982), 196 Mont. 454, 643 P.2d 198.

Chapel himself testified that it was obvious to him that his leg was crooked as it was cast, that it caused him a good deal of pain about which he complained to the doctor and about which the doctor did nothing. Mrs. Chapel also testified that she was concerned about her husband and informed Dr. Allison that she wanted her husband to receive the best possible medical attention and to let her know if the doctor could not handle the case. Chapel inquired of the

doctor whether his leg would remain in the shape that it was cast.

The findings relied on by the District Court in this case show that it weighed the plaintiff's evidence, ultimately finding in favor of the defendant. The power of weighing the evidence belongs to the jury. Therefore, on the basis that the District Court improperly granted a directed verdict, we reverse and remand the cause for further proceedings in accordance with this opinion.

II.

During pretrial procedures before the District Court, the plaintiff made a motion in limine that the "same locality rule" (infra) was not applicable in this case. The court denied the motion, saying:

> The court specifically determines that the rule applicable in this case is that Dr. Allison will be held to the standard of care in February 1983 of a licensed general practitioner, who is not board certified, in the same or similar communities within Montana. Provided, however, experts from elsewhere and in other specialties will be considered competent to testify if they are medically qualified and if they are in fact familiar with the standards for a general practitioner in Livingston or similar communities in Montana at the time in question.

The order of the court correctly reflected the status of the law in Montana relating to the standard of care applicable to general practitioners.

Formerly, the standard of care required of a physician or surgeon in treating a patient was to exercise as reasonable care and skill which "is usually exercised by physicians or surgeons of good standing of the same system or school of practice in the community in which he resides, having due regard to the condition of medical or surgical science at that time." Hansen v. Pock (1920), 57 Mont. 51,

59, 187 P. 282, 285. The "same locality rule" restricted the geographical area from which the degree of care exercised by a physician or surgeon could be determined to the community in which the doctor resided.

In Tallbull v. Whitney (1977), 172 Mont. 326, 564 P.2d 162, this Court examined the "same locality rule" and determined that the foundation for it no longer existed. The reasons given were that the accessibility of medical literature, the frequency and availability of national, regional and state medical meetings, advances of communication of medical knowledge, transportation advances, and the opportunity for rural community doctors to gain medical knowledge in the same manner as doctors in more populous regions in the state, all made the "same locality rule" outdated. In Tallbull, this Court expanded the rule saying:

> For the foregoing reasons, we hold that Montana's "locality rule" imposes on a physician undertaking the care of a patient the legal duty of possessing and exercising that reasonable and ordinary degree of learning, skill and care possessed and exercised by physicians of good standing of the same school of practice in the same or similar locality in Montana. A similar locality in Montana within the meaning of this rule is a locality of similar geographical location, size and character in a medical context.

172 Mont. at 335, 564 P.2d at 166, 167.

The Tallbull rule was modified insofar as it applied to an orthopedic surgeon in Aasheim v. Humberger (1985), 215 Mont. 127, 695 P.2d 824. There, this Court recognized that the defendant was a nationally board-certified orthopedic surgeon and had received comparable training and passed the same national board certification tests as all other board-certified orthopedic specialists in the nation. On that basis, this Court held that when a defendant in a

medical negligence action was a board-certified specialist, his skill and learning would be measured by "the skill and learning possessed by other doctors in good standing, practicing in the same speciality and who hold the same national board certification." Aasheim, 215 Mont. at 130, 695 P.2d at 826. Thenceforth, board certified specialists in Montana would be subject to a national standard of care.

In Glover v. Ballhagen (1988), ___ Mont. ___, 756 P.2d 1166, this Court answered a certified question posed by the Federal District Court of Montana again with respect to the standard of care applicable to national board-certified specialists. In this case, the doctor was a board-certified family practitioner. In Glover, we concluded that:

> . . . the standard of care to which a board certified family practitioner will be held is that skill and learning possessed by other doctors in good standing, practicing with the same national board certification.
>
> . . .
>
> . . . that the party presenting a witness as an expert must establish, to the satisfaction of the trial court, that the witness possesses the requisite knowledge, skill, experience, training, or education to testify as to the diagnosis and treatment in question as to the standard of care applicable to the physician charged with negligence.

Glover, 756 P.2d at 1168.

Thus, in the action against Dr. Ballhagen, this Court held that the expert witness "must be qualified pursuant to Rule 702 to testify as to the standard of care required of a board certified family practitioner."

Not answered in the foregoing cases, and raised as an issue in this case, is whether a non-board-certified general practitioner, practicing in a Montana community, who treats a

patient for an injury of a kind which would fall within an area of practice of an orthopedic surgeon should be held to the degree of care, knowledge and skill of the specialist; or whether, as the District Court determined here, as a general practitioner, in treating a patient for an injury which would fall within the area of practice of an orthopedic surgeon, the general practitioner should be held to that degree of care, knowledge and skill of a general practitioner practicing in the same or similar communities in Montana.

Because of the broad implications to the medical community and to injured patients lurking in whatever decision we made on this issue, we ordered rebriefing and oral argument on the issue and invited briefs from amici curiae.

Here are the arguments marshalled by each side:

Counsel for Chapel maintains that in an age of increasing specialization, a doctor in general practice is under a legal duty, in diagnosing or treating a patient, to seek consultation with or refer a patient to a specialist when the doctor knows or should know in the exercise of reasonable care that the services of a specialist are indicated. Chapel further argues that if there is another mode of treatment that is likely to be more successful for which the physician does not have the facilities or the training to administer, but which is available from specialists, it is the doctor's duty to so advise the patient, and failure to apprise the patient of these facts would constitute a breach of that duty. Chapel also argued the duty to refer does not end with diagnosis. He contends that the general practitioner must also evaluate what progress is made in treating his patient and that if he knows or has reason to know that his method of treatment has failed or has not proven effective, he is under a continuing duty to

consult or to refer. Chapel further points out that in this case, the orthopedic treatment of his leg was not an emergency, and could have been done in later days.

Dr. Allison's brief contends that the Tallbull rule should continue to be applied to general practitioners. Dr. Allison points out that a general practitioner in a small community such as Livingston has an advantage over general practitioners in larger or more populated areas because doctors such as Dr. Allison have occasion to treat many more types of cases than would a general practitioner in a metropolitan area. Dr. Allison had treated 15 injuries similar to Chapels. Dr. Allison also contends that restricting the degree of care to the same or similar communities in Montana is proper because he confronts illnesses and injuries in serving his community whereas practitioners in a larger city devote much of their practice to initial diagnoses with referral to a specialist for anything beyond routine care. Dr. Allison also relies on the Restatement (Second) of Torts, § 299A, Comment G (1965), in support of the Tallbull rule. Dr. Allison also contends that it would be impracticable to require a general practitioner to be held to the standard of care of whatever area of expertise in which his treatment might fall, including an orthopedic surgeon, a dermatologist, a neurologist, an obstetrician, an internist, and so on.

An amicus brief was filed by the Montana Trial Lawyers Association. In it, the Trial Lawyers emphasize that all physicians today receive a standardized education with ongoing common access to sources of medical information in authoritative journals through electronic data retrieval and in continuing medical education seminars. Trial Lawyers point out that Montana has no medical school, and thus, doctors coming into this state to practice necessarily have

received a standarized education, and therefore the degree of care they exercise in treating patients is subject to review on a national basis. Trial Lawyers contend that there is a trend away from the locality rule in most states which apply a national standard of care typically defined as "a physician is under a duty to use that degree of care and skill which is expected of a reasonable competent practitioner in the same class to which it belongs, acting in the same or similar circumstances." Trial Lawyers contend that the phrase "the same or similar circumstances" allows the trier of fact to take into account and to weigh local conditions when the standard is applied, so as to reflect the same "general facilities, services, and options" which were available to the treating doctor. Trial Lawyers contend that limiting expert testimony to the standard of care reflected in the same or similar communities in Montana is too restrictive, and that uniform standards should be applicable to a given situation regardless of locality and that the lack of familiarity of the expert with practice in a particular locality should not disqualify the expert. Trial Lawyers contend that in such cases as presented here, a general practitioner who knows or should have known that a patient's ailment is beyond his knowledge or technical skill is under the duty to disclose the situation to his patient.

An amicus brief was received from the Montana Hospital Association. Essentially, this brief points out the rather dire prospects faced by rural hospitals in Montana. It states that all of Montanas 64 hospitals were only marginally profitable for the past five years but that rural hospitals experienced increasing financial losses. The losses are occuring primarily because of reduced utilization of rural hospitals. Some of the reductions are due to public policies and issues undertaken at both the federal and state levels

with cutbacks in federal and state Medicare and Medicaid programs. The importance of a rural doctor to a rural hospital is emphasized in the brief and the hospitals contend that the similar locality rule is needed in rural areas to keep physicians there providing essential health services and utilizing local rural hospital services. We are urged by the Hospital Association not to abandon the similar locality rule.

Finally, we have received an amicus brief from the Montana Medical Association. In it, the Association points out that it supports a high degree of access to all forms of medical care, especially obstetrical and other services in rural communities; that it desires to maintain the highest degree of quality of medical care in all of Montana communities; that it seeks the enhancement of the physician-patient relationship and when at any given time there is a change in the appropriate standard of care, medical practitioners should have advance notice of the same.

The brief of the Montana Medical Association recognizes the implications of the problem and seems to be seeking a middle ground for its resolution. Thus, with regard to general practitioners, its brief recommends that we continue to adopt the "same or similar locality" standard, without geographical limitations for general practitioners but allow the "national" specialist standard to be applied to any physician who holds himself or herself out as a specialist. Otherwise the Association contends that one who is educated and trained as a general practitioner should generally not be expected or required to meet the standards or to follow the procedures prescribed for a board-certified specialty and should not be measured by the criteria for that specialty other than his own. The brief suggests that the elimination of the Montana boundary restriction on the locality rule is

warranted if the same could be done in this case without modifying the verdict solely as a result of that change, because the concept of advance notice is important when judicial legislation occurs. It points out that if the "same or similar locality" rule for general practitioners is any locality similar in the United States, sound policy reasons support such a change, including: 1) the loss of general practice or family practice services in Montana communities in the rural areas; 2) the lack of specialty care in and of the rural communities for referral of patients; 3) the fact that a general practitioner, though competent to act in areas which overlay specialists' areas, is not necessarily as skilled as a specialist; and, 4) the increased availability of expert witnesses, the lack of which would be some justification for alterations in the law. The brief contends for a balance to be struck between the right of a negligently injured patient to receive compensation through the availability of expert testimony and the right of a doctor to due process and a fair hearing, by insuring that those experts who do testify possess solid practical experience in the type of practice at issue.

On balance, the position asserted by the Montana Medical Association as to the standard of care applicable in cases of this type, with slight modification, appears suitable for adoption by us. For the same reasons as in Tallbull, we abandon the "locality" rule which is limited to Montana communities. It appears proper to revise the rule that now limits the standard of care to be exercised by a general practitioner to be determined by that standard established in similar communities in Montana. The geographical restriction of the state boundary is too narrow in view of the necessity of expert testimony; yet, as the Association contends, the

national standard should not exclude local considerations which face rural general practitioners.

Accordingly, we hold that a non-board-certified general practitioner is held to the standard of care of a "reasonably competent general practitioner acting in the same or similar community in the United States in the same or similar circumstances." See, Shilkret v. Annapolis Emergency Hospital Association (Md. 1975), 349 A.2d 245. "Similar circumstances" permits consideration by the trier of fact of legitimate local factors affecting the ordinary standard of care including the knowledge and experience of the general practitioner, commensurate with the skill of other competent physicians of similar training and experience, with respect to the type of illness or injury he confronts and the resources, facilities and options available to him at the time. Anything in Tallbull to the contrary is hereby reversed, prospectively as hereafter stated.

This opinion applies only to general practitioners, and does not affect board-certified specialists or board-certified general or family practitioners.

We are further persuaded by the brief of the Montana Medical Association that a change of judicial attitude of this nature should be prospective only. We, therefore, order on remand of this case to the District Court that any further proceedings relating to the applicable standard of care of Dr. Allison shall be that standard of care enunciated in the Tallbull case, since that was the standard of care applicable when Dr. Allison treated Chapel.

Moreover, the effect of this opinion with respect to the standard of care required of non-board-certified general practitioners shall be prospective only and shall apply to treatments only by such general practitioners of patients

commencing from and after March 31, 1990, so that the effect of this opinion will be made known to the medical profession.

Reversed and remanded for further proceedings in accordance with this opinion. Costs to Chapel.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices