No.   92-210

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

JAMES FALCON, individually, as
Personal Representative of the
Estate of Louise Falcon,

Plaintiff and Appellant,

-v-

HUNG CHEUNG, M.D., and FRANCES
MAHON DEACONESS HOSPITAL, a
Montana corporation,

Defendants and Respondents.

APPEAL FROM:  District Court of the Seventeenth Judicial District,
In and for the County of Valley,
The Honorable Leonard Langen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Erik B. Thueson, Thueson Law Office, Helena, Montana

For Respondent:

Dennis P. Clarke, Smith, Walsh, Clarke & Gregoire,
Great Falls, Montana, for Hung Cheung, M.D.;
Matthew W. Knierim, Glasgow, Montana, for Frances
Mahon Deaconess Hospital

FILED

MAR 18 1993

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  December 3, 1992

Decided:  March 18, 1993

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an order of the Seventeenth Judicial District Court, Valley County, granting summary judgment in favor of the defendants and dismissing plaintiff's complaint. We affirm.

The issues on appeal are as follows:

1. Whether the District Court erred by excluding the testimony of plaintiff's expert witness, Dr. Robin.

2. Whether the District Court erred in determining that no competent expert testimony established that Dr. Cheung deviated from the applicable standard of care in treating Louise Falcon.

This is a medical malpractice action arising out of the death of Louise Falcon (Falcon) on July 25, 1988. She died from internal bleeding when a Swan-Ganz catheter, placed in her pulmonary artery to monitor her heart, migrated and ruptured or pierced a branch of the artery.

Earlier that day, Falcon entered the Frances Mahon Deaconess Hospital in Glasgow, Montana (the Hospital). Her symptoms included acute respiratory distress, pulmonary edema (fluid in the lungs), declining blood pressure, rapid heart beat and arrhythmia among other things. Falcon had suffered at least two prior heart attacks and had been a heavy cigarette smoker. Dr. Stone, plaintiff's expert witness, testified that she probably suffered from acute congestive heart failure and would have likely died within hours without medical attention.

Dr. Cheung attended Falcon in the emergency room. Dr. Cheung was not board-certified in any specialties at the time. He treated her with drugs that stabilized her condition and then decided to insert a Swan-Ganz catheter to monitor various heart functions.

The Swan-Ganz catheter has a long tube with a balloon tip on the end. The tip contains various electronic sensors that give readings concerning the performance of the heart. An operator inflates the balloon, momentarily blocking the blood flow. The sensors in the tip then transmit readings concerning the various pressures within the vascular system to a video monitor.

The readings obtained from the catheter are known as wedge readings because of the way the balloon wedges against the artery walls. The medical staff uses the information from the wedge readings to further diagnose and treat the patient.

Before Dr. Cheung inserted the catheter, he explained to the family the purpose of a Swan-Ganz catheter and the risks involved in its use. A recognized risk of the Swan-Ganz catheter is that its tip migrates and can perforate the pulmonary artery. If the hole becomes extensive, the patient will die due to massive internal bleeding. Dr. Cheung told the family that the catheter could kill the patient.

To insert the catheter, Dr. Cheung cut a hole in Falcon's subclavian vein, just below the clavicle. He threaded the device into the hole and through the vein towards the heart. He manipulated the device down the superior vena cava and inflated the balloon tip of the catheter. With the aid of the flowing blood, he

3

moved the catheter into the right atrium, then through the right ventricle of the heart and out into the pulmonary artery.

Once the catheter was in place, Dr. Cheung sutured the catheter's sheath to Falcon's chest. He coiled the unused portion of the catheter and taped it down under a sterile bandage. The hospital staff then took an x-ray that showed the catheter properly in place.

The Hospital had a special Swan-Ganz team of nurses that monitored the catheter and periodically obtained wedge readings from it after the doctor inserted the device into Falcon's body. Dr. Cheung checked on her regularly and gave the nurses written orders to obtain wedge readings every four hours. They actually took readings at 8:00 a.m., 9:00 a.m., 10:00 a.m., 2:00 p.m., 4:00 p.m., and 6:00 p.m.

Falcon's condition improved throughout the day. That afternoon, when her sons arrived from west of the continental divide, she remarked that she was all right and that they need not have made the trip.

Dr. Cheung left the hospital just before 4:00 p.m. Shortly thereafter Falcon's respiratory rate increased.

Additionally, a nurse had trouble obtaining a proper wedge during the 4:00 p.m. reading. Instead of wedging, the catheter tip bounced around inside the pulmonary artery. The nurse attempted to correct the problem by withdrawing the catheter approximately one inch, then inflating the balloon and slowly sliding it in, trying

4

to achieve a wedge. However, he was unsuccessful as the balloon did not properly wedge.

The 6:00 p.m. wedge reading showed elevated pressures in the patient's vascular system. The situation did not constitute an emergency, but the nurse thought Dr. Cheung should know of the change. The nurse unsuccessfully attempted to contact Dr. Cheung several times between 6:00 and 8:00 p.m. Dr. Cheung finally got the message and returned the nurse's call at 8:00 p.m.

The nurse explained the changes in the catheter wedge readings and in Falcon's respiration to Dr. Cheung. Dr. Cheung told the nurse to alter the patient's medication rate and to check her blood pressure every five minutes.

Members of Falcon's family testified in their depositions that her lungs were congested and she coughed up some blood at about 5:00 p.m. The nurse on duty was present, as was Falcon's daughter-in-law, who was also a nurse at the Hospital. Neither of them was unduly alarmed and the staff did not note the incident on Falcon's medical records.

At about 8:30 p.m., Falcon began to have coughing spasms and spit-up substantial amounts of blood. A nurse paged Dr. Cheung who arrived at the Hospital within minutes.

Dr. Cheung noticed that the catheter was farther in than he left it, so he began to withdraw it. He stopped after withdrawing about fifteen centimeters of the catheter because the x-ray technicians had arrived to determine the catheter's precise location with an x-ray.

5

The x-ray showed that the catheter's tip was seven centimeters farther into Falcon's body than Dr. Cheung had placed it and that it had migrated into a peripheral branch of the pulmonary artery. A portion of the catheter had coiled in a chamber of Falcon's heart. Dr. Cheung withdrew the catheter from the pulmonary artery to the area of the superior vena cava or the right atrium.

Dr. Cheung then had Falcon transferred by air ambulance to the Montana Deaconess Medical Center in Great Falls. The aircraft picked her up at 1:50 a.m. and she arrived in Great Falls later that morning. There, doctors re-inserted the catheter and otherwise treated her, but she died a few hours later from damage done to her pulmonary artery by the Swan-Ganz catheter.

The defendants, Dr. Cheung and the Frances Mahon Deaconess Hospital, filed motions for summary judgment in this cause. They based their motions on the grounds that neither the plaintiff's expert Dr. Stone nor any of the defendants' experts established that there was malpractice in Falcon's treatment.

After the motions were briefed, the plaintiff named Dr. Eugene Robin as a new expert witness. After taking his deposition, the defendants filed a motion to exclude his testimony on the grounds that he was incompetent to testify on the standard of care in a rural Montana hospital, such as the one in Glasgow.

Following oral arguments on the motions, the District Court entered an order excluding Dr. Robin's testimony and granting summary judgment in favor of the defendants. This appeal follows.

6

Did the District Court err in excluding the testimony of plaintiff's expert witness, Dr. Robin?

Whether a witness is competent to testify as an expert is a question of law. Tallbull v. Whitney (1977), 172 Mont. 326, 335-36, 564 P.2d 162, 167. Our review of a District Court's conclusions of law is plenary. We determine whether the court's conclusions are correct. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

Plaintiff contends that the court should have allowed Dr. Robin's testimony because the Hospital's license review process is subject to standards promulgated by the Joint Commission on Accreditation of Hospitals (JCAH). Plaintiff argues that a national standard of care applies to all hospitals accredited by the JCAH. Plaintiff further argues that because Dr. Robin is familiar with other JCAH accredited hospitals, he is competent to testify as to the standard of care applicable to a general practitioner working at the hospital in Glasgow, Montana. We disagree.

A hospital's election of review by the JCAH for state licensing purposes does not somehow impose a new national legal standard of medical care on the hospital's general practitioners. We have rejected a national standard to help ensure that the rural communities of this state retain their general practitioners and can continue to provide essential medical services. Chapel v. Allison (1990), 241 Mont. 83, 92, 785 P.2d 204, 209-10; see also

7

Swithin S. McGrath, Note, <u>Standards of Medical Care for General Practitioners in Montana: The Chapel Decision and a Move Toward a National Standard</u>, 53 Mont. L. Rev. 119, 121, 132 (1992).

As further discussed below, the legal standard of medical care for non-board-certified general practitioners in Montana is currently governed by the locality rule or an expanded version of the locality rule, depending on the circumstances. See <u>Chapel</u>, 785 P.2d at 210. We hold that a non-board-certified general practitioner in a rural Montana community is not subject to a national standard of care, merely because the practitioner works at a hospital that has chosen to utilize JCAH standards in its license review process.

Plaintiff further contends that the use of a certain piece of equipment, such as a Swan-Ganz catheter, can subject a non-board-certified general practitioner to a national standard of medical care. Plaintiff argues that Dr. Robin is competent to testify concerning a national standard of care applicable to the use of a Swan-Ganz catheter in Glasgow, Montana. We disagree.

As a factual matter, the standard of care for the use of a particular medical device may be the same in a rural Montana hospital as it is anywhere else in the nation. However, case law governs the legal standard of medical care in Montana. See <u>Tallbull</u>, 564 P.2d at 166-67; <u>Chapel</u>, 785 P.2d at 210. For an expert witness in a medical malpractice case to be competent to testify concerning the standard of care, the expert must qualify

8

under either <u>Tallbull</u> or <u>Chapel</u>, depending on when the defendant treated the patient. See <u>Chapel</u>, 785 P.2d at 210.

The <u>Chapel</u> decision expanded Montana's legal standard of medical care, but it does not apply in the present case. In <u>Chapel</u> we stated that the new standard of care required of non-board-certified general practitioners applies only if the doctor treated the patient after March 31, 1990. <u>Chapel</u>, 785 P.2d at 210.

The present case accrued on July 25, 1988, which is before the effective date of the new standard set forth in <u>Chapel</u>. Consequently, the old locality rule delineated in <u>Tallbull</u> governs this case. To testify as to the standard of care in this case then, Dr. Robin must be familiar with the standard of practice in Glasgow or a similar locality in Montana, considering geographical location, size, and character of the community in general. See <u>Tallbull</u>, 564 P.2d at 166-67.

The District Court excluded Dr. Robin's testimony because his deposition showed that he did not know the standard of practice in Glasgow or a similar community in Montana. The court based its decision on the following.

Dr. Robin had never practiced medicine in Montana, nor had he practiced in a rural hospital in another state. He became a faculty member at a university hospital immediately after medical school. His medical practice has consisted solely of practice in university medical hospitals with 400 to 1000 beds and hundreds of specialized physicians on staff.

9

The evidence showed that Dr. Robin was not familiar with the standard of practice or the medical facilities in Glasgow, in a similar locality in Montana, or even in a similar locality anywhere else in the country.

On this basis, the District Court concluded Dr. Robin was not competent to testify concerning the standard of care applicable to a non-board-certified general practitioner in Glasgow, Montana. The District Court was correct.

## II.

Did the District Court err in determining that no competent expert testimony established that Dr. Cheung deviated from the applicable standard of care in treating Louise Falcon?

The District Court granted summary judgment in favor of the defendants because the plaintiff did not provide competent expert testimony showing that a departure from the applicable standard of care by the defendants caused Falcon's death. We hold that the District Court was correct.

Plaintiff contends that a factual issue exists as to when the catheter first began to injure Falcon. Falcon's relatives testified that she coughed at 5:00 p.m. and some blood came up with her sputum. Plaintiff argues that this testimony created an issue of fact whether the catheter started to pierce her pulmonary artery at that time, or at 8:30 when she coughed up copious quantities of blood.

Plaintiff further contends that Dr. Cheung violated the standard of care in several ways. First, plaintiff alleges that

10

Falcon's coughing of small amounts of blood at 5:00 p.m. constituted an emergency and the nurses should have contacted Dr. Cheung immediately. Second, plaintiff alleges that Dr. Cheung violated the standard of care by not responding to calls and pages from the nurses between 6:00 p.m. and 8:00 p.m. Third, plaintiff implies that the catheter migrated because it was improperly secured to Falcon's chest, although there is no evidence of this. Fourth, plaintiff alleges that Dr. Cheung and the hospital violated the standard of care because of delay in deciding to transfer Falcon to another hospital after she coughed up massive amounts of blood at 8:30 p.m.

These issues are not material issues of fact, however, until the plaintiff produces a medical expert competent to establish the applicable standard of care and a departure from the standard. See Hunter v. Missoula Community Hospital (1988), 230 Mont. 300, 301, 750 P.2d 106, 106. In this case, the plaintiff did not provide competent expert testimony establishing that a departure from the applicable standard of care caused Falcon's death. Therefore, plaintiff's alleged issues of fact leading to departures from the standard of care are not material issues of fact. See Hunter, 750 P.2d at 106.

In Montana, a defendant doctor is entitled to summary judgment as a matter of law if the plaintiff fails to present competent expert medical testimony that establishes the applicable standard of medical care, that the defendant departed from the standard, and that the departure from the standard proximately caused plaintiff's

11

injury. Montana Deaconess Hospital v. Gratton (1976), 169 Mont. 185, 190, 545 P.2d 670, 673; Hunter, 750 P.2d at 106.

As discussed above, plaintiff's expert Dr. Robin, was not competent to testify concerning the applicable standard of care. His testimony, therefore, cannot establish that a departure from the applicable standard of care caused Falcon's death.

As to plaintiff's expert Dr. Stone, at one point in his deposition, he agreed that "had it not been for the failure to follow the standard of care for a Swan-Ganz catheter, Louise Falcon would have survived the disease process for which she was originally hospitalized. The medical records do not indicate that she died of the illness for which she was admitted."

At other places in his deposition, however, Dr. Stone clarified his statement, indicating that although the catheter killed Falcon, negligence in its use did not cause her death. This conforms with the testimony of the defendants' expert witnesses who agree that the Swan-Ganz catheter killed Falcon, but deny that any departure from the standard of care by the defendants caused Falcon's death.

Dr. Stone testified directly that Dr. Cheung was not clearly negligent in his prompt decision to use the catheter, rather it was a "question of whether there is some error in judgment that might have contributed to some negligence." He was unsure whether it was appropriate to use a Swan-Ganz catheter in a rural hospital under the circumstances. But after learning more about the situation, he testified that this might be one of the cases where its use was

12

appropriate and its use was certainly not outside the standard of care. He further testified that Dr. Cheung's behavior "fell within the range of acceptable medical treatment."

Dr. Stone opined that perhaps the catheter migrated because it was improperly secured or maybe because someone pushed it in further. But he admitted there was no evidence that anyone manipulated the catheter in a manner that would cause it to migrate. He presented no evidence that the catheter was improperly secured. In addition, Dr. Stone testified that he had lost two patients due to pulmonary hemorrhaging caused by Swan-Ganz catheters.

Dr. Stone did not believe that the problems in locating Dr. Cheung between 6:00 and 8:00 p.m. had anything to do with the cause of Falcon's death. He testified that there was no evidence that the catheter either migrated or caused problems before 8:30 p.m., and that the record indicated that Falcon's condition was fine at 8:00 p.m.

Initially in his deposition, Dr. Stone raised the issue of whether the hospital staff should have transferred Falcon to a larger facility more promptly after she coughed massive quantities of blood. Later, however, he went on to testify that it was not inappropriate for the Hospital to retain the patient as long as it did. He testified that, not knowing of the overall hospital situation, he merely raised the question to further explore whether or not a delay in transferring the patient was an issue.

13

In summary, Dr. Stone did not specify any departure from the standard of care that caused Falcon's death, therefore the defendants are entitled to summary judgment as a matter of law. See Montana Deaconess Hospital, 545 P.2d at 673; Hunter, 750 P.2d at 106. The District Court was correct in granting summary judgment because the plaintiff failed to present competent expert testimony showing that a departure from the applicable standard of care by the defendants caused Falcon's death. Affirmed.

_____
                         Justice

We Concur:

_____
         Chief Justice

_____

_____

_____
         Justices

Justice Terry N. Trieweiler did not participate in this opinion.

Justice William E. Hunt, Sr., dissenting.

I dissent. The majority states the second issue to be whether the District Court erred in determining that there was no competent expert testimony establishing that Dr. Cheung deviated from the applicable standard of care in treating Louise Falcon.

A material issue of fact is raised when a plaintiff produces a medical expert competent to establish the applicable standard of care and that the defendant departed from that standard which proximately caused plaintiff's injury. Gratton, 545 P.2d at 673. In his deposition, Dr. Stone agreed that:

> [H]ad it not been for the failure to follow the standard of care for a Swan-Ganz catheter, Louise Falcon would have survived the disease process for which she was originally hospitalized. The medical records do not indicate that she died of the illness for which she was admitted.

In my opinion, this statement alone creates a material issue of fact that Dr. Cheung departed from the applicable standard of care which proximately caused Falcon's death. Based upon this statement, the court should have denied summary judgment and allowed the case to proceed to trial.

With the advent of the technological and information revolutions, there is no reason why a patient living in Glasgow does not deserve the same standard of care as a patient living anywhere else in the nation. The need for rural doctors in Montana does not excuse a physician's negligence. I would reverse the summary judgment and allow this case to proceed to trial.

_____
Justice

15