No. 92-191

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

DEBRA O'LEYAR,

        Plaintiff and Respondent,

-vs-

DENNIS B. CALLENDER, M.D.

        Defendant and Appellant.

FILED

DEC 1 - 1992

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Bruce R. Toole; John T. Dyre; Crowley, Haughey,
Hanson, Toole & Dietrich; Billings, Montana

        For Respondent:

            John C. Hoyt; Alexander Blewett, III; Hoyt &
Blewett; Great Falls, Montana

Submitted on Briefs:  August 27, 1992

Decided:  December 1, 1992

Filed:

_____
       Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an Eighth Judicial District Court, Cascade County jury trial award of $2,000,000 in a medical malpractice action. We affirm.

There are several issues on appeal:

1. Did the trial court err in disallowing expert opinion testimony by Dr. Davis?

2. Did the trial court err in admitting the photographs of the pathology slides?

3. Was there improper jury voir dire?

4. Were improper comments made by the trial court?

5. Did the trial court err regarding the direct examination of Dr. Callender?

6. Did the trial court properly instruct the jury?

7. May Callender impeach the jury verdict through affidavits?

Debra O'Leyar (Ms. O'Leyar) is a woman with Hidradenitis Suppurativa (HS), a disease of the apocrine glands. HS results in abscesses and boils which can be quite uncomfortable or painful. When Ms. O'Leyar went to her gynecologist, Dr. Dennis Callender (Dr. Callender), in July of 1988 for her regular yearly checkup, she was suffering from the symptoms of HS. Dr. Callender noticed an HS lesion and the two discussed treatment for the outbreak of HS. Dr. Callender referred Ms. O'Leyar to Dr. Baldridge, a Great Falls dermatologist, who referred her back to Dr. Callender.

Dr. Callender ultimately performed laser surgery on Ms.

2

O'Leyar to remove areas of HS infection. The night before surgery, as instructed by Dr. Callender, Ms. O'Leyar used a magic marker to mark the places in her groin area where she could feel HS. There was a dispute concerning whether Dr. Callender excised the area that Ms. O'Leyar marked or a larger area. The surgery was conducted and thereafter, Ms. O'Leyar had severe complications, resulting in anal stenosis and fecal incontinence.

I

Did the trial court err in disallowing expert opinion testimony by Dr. Davis?

Dr. Davis, Callender's chief expert, was not allowed to give testimony concerning nerve damage affecting the sphincter muscle. Upon Callender's counsel asking the following question, O'Leyar's counsel objected: "If the testimony was that Dr. Callender injured nerve fibers, and that the injury of these nerve fibers rendered the entire surface of the nerve--service of the nerve to the sphincter muscle making it dysfunctional, would you agree or disagree?" O'Leyar's counsel requested voir dire to establish a foundation for Davis to testify concerning the sphincter muscle. O'Leyar contended that because of Davis' earlier deposition statement, he was incompetent to testify regarding the sphincter muscle. Dr. Davis had previously stated that "the sphincter muscle is a very complex system, which I have not studied in a long time, so, I am sorry, I am incompetent in that area."

Callender's counsel argued that the question was permissible

3

because he was actually asking questions about the pudendal nerve, which services the sphincter muscle. The court, however, concluded Dr. Davis was incompetent in this area by his own admission and could not testify in that particular area. Callender's counsel requested to make an offer of proof and this was done in chambers.

Was Dr. Davis incompetent to testify regarding the sphincter muscle? Even though Dr. Davis may deal with the pudendal nerve in his work, he was asked to talk about the nerve in its relation to the sphincter muscle. Dr. Davis specifically stated that he was incompetent to testify concerning the sphincter muscle. "[T]he party presenting a witness as an expert must establish, to the satisfaction of the trial court, that the witness possesses the requisite knowledge, skill, experience, training, and education to testify as to the diagnosis and treatment in question...." Glover v. Ballhagen (1988), 232 Mont. 427, 430, 756 P.2d 1166, 1168. "[T]he determination of the qualification of a skilled or expert witness is a matter largely within the discretion of the trial judge and, in the absence of a showing of abuse, ordinarily will not be disturbed." Goodnough v. State (1982), 199 Mont. 9, 18, 647 P.2d 364, 369. We conclude the trial court did not abuse its discretion.

II

Did the trial court err in admitting photographs of the pathology slides?

Pathologist, Dr. Dachs, made slides of the tissue removed from

4

Ms. O'Leyar shortly after the laser procedure and issued a pathology report concerning the tissue slides. At a later date, Ms. O'Leyar's attorney contacted Dr. Dachs and asked him to review the slides for the presence of nerve fibers or muscle bundle. Dr. Dachs viewed the slides again and reported to Ms. O'Leyar's counsel, via a letter, stating that he had seen nerve fibers and muscle bundles in the slides. Ms. O'Leyar's counsel asked Dr. Dachs to take photographs of the slides for use at trial.

Callender's counsel states that he learned about the letter and photographs of the slides during the deposition of Dr. Scott on October 21, 1991. Ms. O'Leyar's use of those photographs became an issue in chambers during the course of the trial. During this recess in chambers, Callender's counsel stated that he made copies of the photographs within a few days to a week of Dr. Scott's deposition and sent them to Dr. Davis. The court responded to counsel's statement by saying "that's 3 weeks." Callender's counsel responded "I am not complaining about that, I am complaining about Zander's attack on him (Davis) and trying to impeach him for having a slightly different opinion when he did his deposition, because the slides weren't available and that's not fair." The court concluded that Callender's counsel could rehabilitate Dr. Davis by explaining that he did not have the slides when he gave his opinion during his deposition. Callender's counsel was amenable to this and no further objection was heard.

However, by Callender's counsel's own admission, the photos

5

were known and available to him within at least 15 days before trial. According to the pretrial order, dated August 6, 1991, the trial was rescheduled and all discovery was to "be completed 15 days prior to the trial." Even if it took Callender's counsel a week to prepare copies of the photographs, the pictures would have been available to the defense 15 days before trial and within the calendar scheduled in the pretrial order.

### III

Did the court allow improper voir dire?

Ms. O'Leyar's counsel discussed Ms. O'Leyar's HS condition, her past successful treatment of that condition and Dr. Callender's treatment of the HS by using laser surgery. He also related that Dr. Callender had never before used laser surgery for this type of procedure. Also, he described the complications of the surgery and her current life as a result of those complications. These are the salient facts that form the basis for Ms. O'Leyar's action against Dr. Callender. The judge concluded that this voir dire was within acceptable limits. "It has long been held in this state and other jurisdictions that a trial judge has wide discretion in conducting voir dire." State v. Poncelet (1980), 187 Mont. 528, 541, 610 P.2d 698, 706.

Callender also contends that it was prejudicial for Ms. O'Leyar's counsel to relate to the jury that the judge had previously granted summary judgment on the issue of consent to remove Ms. O'Leyar's hemorrhoid tags. (When Dr. Callender was

6

operating on Ms. O'Leyar's HS areas, he removed hemorrhoid tags near her anus as a "courtesy.") This information streamlined the issues for the jury and made them aware that they did not have to consider whether the doctor had his patient's consent to remove her hemorrhoid tags – this issue had been previously decided. We conclude the trial judge did not err in his handling of the voir dire.

IV

Were improper comments made by the trial court?

Rule 103(a)(1), M.R.Evid., states that "...Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1)...[i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context. . . ." In this case, there was only one objection to a comment made by the judge.

This objection was made to a comment which occurred during cross examination of Dr. Davis. Dr. Davis was asked his opinion concerning the depth of Dr. Callender's surgery for the HS. Dr. Davis asked if he could use the slides to answer the question. The court replied, "Just answer the question." Callender's counsel then stated, "We object to that, Your Honor." Counsel made no attempt to explain the objection or to put the judge on notice that his comments might be reviewed on appeal.

7

Furthermore, Rule 611(a)(2), M.R.Evid., states ". . . [t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to...(2)avoid needless consumption of time." It is within the judge's discretion to adjust the tempo and flow of the proceedings.

V

Did the trial court err regarding the direct examination of Dr. Callender?

Although Callender's attorney argues that it was error to preclude examination of Dr. Callender by his attorney directly after he was examined as an adverse witness by Ms. O'Leyar's attorney, he made no objection to the court's action at the time. "This Court has made it clear that where a defendant does not object at trial to the remarks and conduct of the trial judge, the issue will not be considered upon appeal." State v. Martin (1987), 226 Mont. 463, 467, 736 P.2d 477, 480.

Furthermore, Rule 611, M.R.Evid., states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ...(1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time...." The Commission Comments on the rule state that "order of presentation refers to the alteration of the normal order of presentation of evidence by the parties at the discretion of the court." (Emphasis added.)

8

Further comments to Rule 611, M.R.Evid., suggest that the order of trial is a matter of discretion for the court, and has been since R.C.M. 93-1901-9 and cases interpreting the statutes. Wyant v. Dunn (1962), 140 Mont. 181, 368 P.2d 917, remains as viable today as it did when it was written.

In Wyant, the Court concluded that the trial court did not abuse its discretion when it denied the defendant the right to reexamine the defendant immediately after an adverse examination by the plaintiff. The defendant was called by his counsel later that day and he was examined fully as to his examination as an adverse witness. Wyant, 368 P.2d at 920-921.

The trial court may use its discretion to rearrange the order of the trial. In fact, Callender was called the very next day and was given a full opportunity to provide testimony and evidence to support his case as well as to counter the plaintiff's case.

## VI

Did the trial court properly instruct the jury?

Callender argues that the "mere fact of injury" instruction should have been given to the jury because there was no instruction given to prevent the jurors from believing "that because the injuries were so severe, there must have been negligence." Ms. O'Leyar counters that the instructions provided still made her prove that Callender "violated the standard of care described in these instructions or that he failed to obtain informed consent" and that these instructions set forth appropriate Montana law and

9

were not objected to at trial.

We conclude that the jury instructions were properly given. Instruction 11 states "[p]laintiff contends that through his failure to provide proper care in operating on plaintiff, that defendant was negligent, and this negligence caused her damages. In this regard, plaintiff has the burden or proving:

(1) That the defendant was negligent.

(2) That the plaintiff was injured.

(3) That defendant's negligence was a proximate cause of plaintiff's damage.

(4) The amount of money that will compensate the plaintiff for her damage."

This instruction informs the jury that if the defendant fails to provide "proper care" to the plaintiff, then he has been negligent. It establishes a threshold over which the plaintiff's proof must pass before the doctor is considered "negligent." This threshold is clearly more than presenting a severe injury and expecting the jury to believe that the injury must be the result of negligence merely because of its severity. The plaintiff must prove that the doctor did not provide "proper care."

Instruction 13 provides: "[i]t is the doctor's duty to use that skill and learning as ordinarily used in like cases by other doctors practicing in that same specialty and who hold the same national board certification, at the time the services were provided. The violation of this duty is negligence." This

10

instruction also supports the argument that the defendant is not negligent unless he fails to give proper care and uses skills comparable to other doctors in good standing.

Instruction 17 advises the jury that the proper test for determining negligence in a doctor's actions is "whether the doctor's performance met the accepted standards of skill and care . . . ." The instructions given were sufficient.

## VII

May Callender impeach the jury verdict through affidavits?

Rule 606 concerns the competency of juror as witness and is at issue here. Rule 606 (b), M.R.Evid. provides:

> (b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
> However, as an exception to this subdivision, a juror may testify and an affidavit or evidence of any kind be received as to any matter or statement concerning only the following questions, whether occurring during the course of the jury's deliberations or not: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; or (2) whether any outside influence was brought to bear upon any juror; or (3) whether any juror has been induced to assent to any general or special verdict, or finding on any question submitted to them by the court, by a resort to the determination of chance.

Callender contends that the jury considered extraneous matters during its deliberations and therefore, the case should be remanded

11

for a new trial. We disagree with Callender.

Rule 606(b) contemplates that a juror may not testify upon matters occurring during the jury's deliberations or anything upon his or other juror's minds, emotions or mental processes that is connected with reaching a decision on the verdict. The rule is concerned with extraneous information brought to the attention of the jury. Examples of extraneous information include: comments by the bailiff, telephoning a relative for information, and visiting the scene of an accident. See Henrichs v. Todd (1990), 245 Mont. 286, 800 P.2d 710; Schmoyer v. Bourdeau (1966), 148 Mont. 340, 420 P.2d 316; Goff v. Kinzle (1966), 148 Mont. 61, 417 P.2d 105.

However, in this case, we are not concerned with extraneous information - there is no allegation that someone outside of the jurors discussed jury issues with the jurors. What the defendant wants this Court to consider are the internal mechanisms of the jurors' decision making process. This is improper according to Rule 606(b), M.R.Evid., which does not allow juror testimony regarding the thought processes of the jurors during deliberation.

"Internal" processes are out of the reach of juror affidavits which impeach the jury verdict. As we stated in Harry v. Elderkin (1981), 196 Mont. 1, 8, 637 P.2d 809, 813, "[w]here external influence is exerted on the jury or where extraneous prejudicial information is brought to the jury's attention, juror affidavits can be the basis for overturning the judgment if either party was thereby deprived of a fair trial. . . . (Citations omitted.) On

12

the other hand, juror affidavits may not be used to impeach the verdict based upon <u>internal influences</u> on the jury, such as a mistake of evidence or misapprehension of the law." (Emphasis added.) AFFIRMED.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices