JUSTICE RICE,
dissenting.
¶41 I disagree with the Court’s conclusion regarding Dr. Houchin’s ability to testify regarding the standard of care applicable to neurosurgeons. The Court recognizes that Dr. Houchin was not qualified to render an expert opinion regarding the standard of care governing a board-certified neurosurgeon’s obtaining a patient’s informed consent about the risks of the surgery itself. See Opinion, ¶ 31. Nonetheless, the Court determines that Dr. Houchin was qualified to render an expert opinion regarding the standard of care governing a board-certified neurosurgeon’s obtaining a patient’s informed consent about alternatives to PTC surgery. See Opinion, ¶ 33.1 do not believe the distinction the Court has made between these subcomponents of informed consent is viable. Both are part of the patient’s giving of consent to the neurosurgeon for surgery, and are obtained in a singular process. As Dr. Houchin acknowledged, “An opinion on the neuro-surgical technique utilized and/or the informed consent process ... would best be deferred to an expert in neuro-surgery.” (Emphasis added.)
¶42 This is further illustrated by the deposition testimony regarding *406 the respective qualifications and duties of the practitioners involved in this case. Dr. Houchin is not board-certified in neurology, has not been trained in neurosurgery, and does not perform the surgery at issue in this case. Dr. Houchin is a neuro-opthamologist who is an expert on alternative (nonsurgical) treatment of PTC. As the Court notes, Dr. Houchin testified that 90% of his patients respond to alternative treatment of PTC, and he refers them for neurosurgery “only if the conservative treatment measures fail.” Opinion, ¶ 32 (emphasis added). By Dr. Houchin’s admission, all patients who are referred by him for neurosurgery have already tried alternative treatment, and have failed to obtain relief. At that point, his practice and expertise have ended, and the patient is placed in the hands of the neurosurgeon.
¶43 Dr. Frank’s deposition testimony confirmed this assessment. Under questioning by Griffins’ counsel about a neurosurgeon’s standard of care, he testified as follows:
Q. Before neurosurgeons in general would agree to operate or use a surgical option, there would have to be some sort of work or inquiry as to whether or not medical treatment had been tried on a particular patient and didn’t work, and that’s the reason that they were referred for surgery?
A. Well, the referral for surgery would imply that medical treatment-conservative treatment had failed.
Q. What would you do in a situation where the records from her referring physician were silent as to whether or not medical therapy had been tried? ...
A. As I also said before, I believe, that we would get a referral from someone that was a neurologist or a neuro-ophthalmologist, which would mean that they have exhausted the conservative treatment, which is their area of expertise. A cover letter often does not include everything that has been done. [Emphasis added.]
¶44 Dr. Frank thus agrees with Dr. Houchin’s practice on this point-that patients are not referred to neurosurgeons until they have already exhausted conservative treatment. Dr. Houchin’s expertise is also exhausted at this point, as he is not qualified by either training or experience to render an expert opinion on how a neurosurgeon should proceed after the referral-in other words, to establish the neurosurgeon’s standard of care.
¶45 It is true that, during the later course of Dr. Frank’s deposition, *407 lie opined within an expanded discussion that a neurosurgeon should discuss alternative treatments with referred patients, despite his earlier testimony that a referral meant that alternative treatments had already failed. However, we have never held that the standard of care can be established through a defendant’s expert and, nationally, courts have resisted doing so. We have explained that the two exceptions to the plaintiffs duty to provide qualified expert testimony regarding a defendant’s standard of care are, first, when the conduct complained of is readily ascertainable by a layperson and, second, when a defendant doctor’s own testimony establishes the standard of care and departure from it. See Dalton v. Kalispell Regional Hosp., 256 Mont. 243, 246, 846 P.2d 960, 961-62 (1993); Hunter v. Missoula Community Hosp., 230 Mont. 300, 305, 750 P.2d 106, 109 (1988).
¶46 “The trial court has broad discretion in determining whether a particular witness is qualified to testify as an expert.” Glover v. Ballhagen, 232 Mont. 427, 430, 756 P.2d 1166, 1168 (1988); see also O’Leyar v. Callender, 255 Mont. 277, 281, 843 P.2d 304, 306 (1992). Given the record, I cannot conclude that the District Court abused its broad discretion in determining that Dr. Houchin was not qualified to testify regarding a neurosurgeon’s standard of care. Because the Court’s conclusion on this point is central to its reversal under both Issues 1 and 2, I dissent and would affirm the District Court.