DA 12-0046

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 283

FILED

December 11 2012

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

ANN M. BROOKINS, as an individual and
ANN M. BROOKINS, as natural parent
and legal guardian on behalf of
ALLEN GOTCHER, a minor.

        Plaintiff and Appellant,

   v.

FREDERICK MOTE, M.D. and
MINERAL COMMUNITY HOSPITAL,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Fourth Judicial District,
                 In and For the County of Missoula, Cause No. DV 05-410
                 Honorable Karen Townsend, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           James P. O'Brien; O'Brien Law Office, P.C.; Missoula, Montana

       For Appellee:

           Gary Kalkstein, Travis B. Dye; Kalkstein, Johnson & Dye, P.C.;
           Missoula, Montana

                             Submitted on Briefs:  August 22, 2012

                                   Decided:   December 11, 2012

Filed:

                   _____

                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Ann M. Brookins (Ann) appeals from three orders of the Fourth Judicial District Court. The first reopened discovery, while the other two granted summary judgment to the Mineral Community Hospital (the Hospital) on all of Ann's claims. We address the following issues and affirm:

¶2      *1. Did the District Court err in reopening discovery?*

¶3      *2. Did the District Court err in granting summary judgment to the Hospital on the agency claims?*

¶4      *3. Did the District Court err in granting summary judgment to the Hospital on the joint venture claim?*

¶5      *4. Did the District Court err in granting summary judgment to the Hospital on the Consumer Protection Act Claim?*

¶6      *5. Did the District Court err in granting summary judgment to the Hospital on the negligent credentialing claim?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶7      In early 1993, Ann gave birth to Allen Gotcher (Allen) at the Hospital in Superior. Dr. Frederick Mote (Dr. Mote) was Ann's obstetrician and delivered Allen. Medical complications arose prior to and after Allen's delivery, leading to problems with Allen's brain development. In 2005, Ann, individually and on behalf of Allen, sued Dr. Mote and the Hospital. She subsequently settled her claims with Dr. Mote. This appeal arises out of pre-trial rulings made by the District Court in Ann's litigation with the Hospital.

¶8      At the time of Allen's birth, Dr. Mote was living in Superior for a second time. He originally moved to Superior from Oregon in early 1992 to take employment at the

Hospital, but his stay was short-lived. In April 1992, Dr. Mote was charged in the State of Oregon with sexual abuse of a minor and endangering the welfare of a minor. He resigned his employment with the Hospital and returned to Oregon to face the charges.

¶9 Dr. Mote's legal difficulties were reported in local newspapers, the *Mineral Independent* and *Missoulian*, throughout the spring and summer of 1992. The Hospital wrote an "Open Letter to the Mineral County Community" in the *Mineral Independent*, explaining that the Hospital was taking steps to ensure patient safety. The *Mineral Independent* reported Dr. Mote's departure from Superior, and later reported that he had pleaded guilty to misdemeanor sexual abuse of a child. As part of his sentence, Dr. Mote attended a rehabilitation facility in Minnesota that specialized in sexual addiction.

¶10 In September 1992, the Montana Board of Medical Examiners (the Medical Board) and Dr. Mote entered an agreement providing that Dr. Mote would keep his medical license, subject to a 15-year probationary period and a prohibition on treatment of minor patients unless a third party was present. Dr. Mote returned to Superior but the Hospital determined not to rehire him as an employee. Dr. Mote opened a private practice in his home. After review, the Hospital extended credentials for Dr. Mote to use the Hospital's facilities as an independent physician. A letter from Madelyn Faller (Faller), the Hospital's chief administrative officer during the early 1990's, advising the public of these circumstances was published in the *Mineral Independent*.

¶11 Ann hired Dr. Mote as her obstetrician immediately following his return to Superior. Ann was living in St. Regis and was approximately four months pregnant.

3

Ann's mother, Fran Brookins (Fran), was a registered nurse at the Hospital. According to Fran, she and Ann discussed whether Dr. Mote should be Ann's doctor given his conviction in Oregon. Ann decided to hire Dr. Mote because his home-office was close to Ann's residence and she was concerned about not being able to make it to a Missoula hospital when it came time to deliver her child. All of Ann's prenatal appointments with Dr. Mote were conducted at his home-office. The only times Ann recalled going to the Hospital prior to delivery were for ultrasound procedures and blood tests. These were performed by Hospital staff without Dr. Mote being present.

¶12 Allen was born in February of 1992, and Dr. Mote delivered him at the Hospital. Medical complications persisted during Allen's pre-delivery, delivery, and post-delivery periods, which may have caused brain development problems. Allen has since been diagnosed with brain damage, resulting in learning difficulties.

¶13 In April 2005, Ann, individually and on behalf of Allen, sued Dr. Mote and the Hospital. Ann claimed malpractice against Dr. Mote for his care of Allen, assault and battery for his performance of unnecessary pelvic exams on Ann, and "unauthorized sexual contact with Allen during Dr. Mote's delivery, examination and subsequent circumcision" in violation of the restrictions placed on his medical license. Against the Hospital, Ann alleged it was vicariously liable for Dr. Mote's negligence under agency and joint venture theories, and directly liable under the Consumer Protection Act and negligent credentialing theories for allowing Dr. Mote to use its facilities. After Ann settled her claims against Dr. Mote and the District Court dismissed him with prejudice in

4

August 2007, the lawsuit was dormant for over a year thereafter, but moved forward after the District Court ordered Ann to file a status report.

¶14 During the ensuing discovery process, neither party adhered to the court-ordered deadlines. The District Court issued three scheduling orders extending deadlines, and the parties agreed between themselves to extend deadlines on several occasions. The parties eventually became embroiled in two disputes, resulting in a discovery standoff. The first concerned the Hospital's failure to provide complete M. R. Civ. P. 26(b)(4) disclosures for the three expert witnesses it retained to compare a 1993 MRI with a 2000 MRI of Allen's brain by the May 11, 2010 deadline.[1] In correspondence to Ann's counsel, defense counsel explained that because the Hospital could not locate the 1993 MRI, the experts could not compare it with the 2000 MRI and thus, disclosures could not be completed by the deadline. The search culminated in the Hospital subpoenaing St. Patrick Hospital in Missoula (where the 1993 MRI had taken place) to produce a copy of the 1993 MRI.

¶15 The second dispute pertained to the deposition of two of Ann's experts. The Hospital repeatedly asked Ann for times her experts could be deposed, but Ann's counsel was resistant to allow their depositions before receiving the Hospital's expert disclosures, believing it would give the Hospital an unfair advantage. Throughout the summer of 2010, the parties continued these back and forth demands. Eventually, St. Patrick

---

[1] The Hospital was interested in this evidence because an earlier report compiled as part of the Medical Malpractice Legal Panel proceedings suggested that the 2000 MRI showed brain damage that was not present in the 1993 MRI, suggesting that trauma other than Dr. Mote's delivery caused Allen's brain injuries.

5

advised the parties that, pursuant to protocol, the 1993 MRI had been destroyed following a seven year storage period. With no opportunity for its experts to analyze the earlier MRI, the Hospital moved to name a different expert.

¶16 Ann moved to exclude any expert witnesses the Hospital had not fully disclosed by the May 11, 2010 deadline—namely, the expert hired to replace its MRI experts—asking the court to strictly enforce the discovery deadlines. The Hospital countered that Ann should not benefit from strict enforcement of the scheduling order because she had routinely missed deadlines. The Hospital also pointed out that its disclosure was delayed by circumstances out of its control—the search for the 1993 MRI that was destroyed by St. Patrick Hospital. The Hospital moved to extend discovery, or alternatively, to exclude Ann's experts it had not deposed.

¶17 After a hearing, the court issued an order extending discovery deadlines. The court stated that both parties' request to exclude the other side's expert witness was "extreme" and found the Hospital's failure to provide full disclosures was "excusable in light of the late discovery that the films of the 1993 MRI had been destroyed." The court further held that Ann's delay in presenting her experts for deposition was "also excusable" since the Hospital had not made its expert disclosures. Ann moved the court to reconsider its ruling, arguing the court had erred, *inter alia,*[2] by extending discovery deadlines after they had closed without a finding of "excusable neglect." The court

---

[2] In her motion for reconsideration, Ann asserted seven grounds of error, but does not raise all of them on appeal.

entered an order clarifying that it found both parties' failure to comply with discovery was due to "excusable neglect."

¶18 Discovery proceeded, including two depositions which are particularly relevant to this appeal. Ann deposed Faller, who testified that as the Hospital's chief administrative officer she had used a recruiting service to initially contact Dr. Mote. Following Dr. Mote's resignation and resolution of his criminal charges, Faller said the Hospital decided not to rehire him. Faller contacted the treatment center Dr. Mote attended in Minnesota and was advised that Dr. Mote "was not a pedophile and that he would not reoffend." As to re-credentialing Dr. Mote as an independent physician after his return to Superior, Faller testified that Dr. Mote was required to submit an application, about which Fallen was questioned extensively.

¶19 The Hospital deposed Ann's expert on hospital credentialing, Dr. Daniel Boatman (Dr. Boatman). Dr. Boatman had submitted his expert disclosure about three years earlier. The disclosure explained that the "standard practice" in hospitals before credentialing a doctor required, *inter alia*:

> [A] query to the National Practitioner Data Bank, verification of medical school education, verification of licensure in any and all other states the physician indicates licensure in and status, verification of DEA licensure status, and any restrictions, request for professional references and a series of questions on the medical staff application regarding drug or alcohol use or criminal convictions.

However, regarding whether the Hospital had breached this standard of care, Dr. Boatman stated: "Without a credentials file for Dr. Mote, however, I cannot render an

7

opinion about the medical staff privileges granted as a violation of the standard of care for hospitals." Additional statements from these depositions will be referenced herein.

¶20 Following discovery, both Ann and the Hospital moved for summary judgment. The District Court granted summary judgment to the Hospital on all claims and entered judgment in favor of the Hospital. Ann appeals.

## STANDARD OF REVIEW

¶21 In recognition of the district court's "inherent discretionary power to control discovery" and its "authority to control trial administration[,]" we review discretionary pre-trial and discovery rulings for abuse of discretion. *Anderson v. Werner Enterprises, Inc.*, 1998 MT 333, ¶ 13, 292 Mont. 284, 972 P.2d 806. Further, in interpreting discovery rules, "this Court will reverse the trial judge only when his or her judgment may materially affect the substantial rights of the complaining party and allow the possibility of a miscarriage of justice." *Anderson*, ¶ 13. "We will not reverse the District Court when it reaches the right result, even if for the wrong reason." *Palmer v. Bahm*, 2006 MT 29, ¶ 20, 331 Mont. 105, 128 P.3d 1031.

¶22 We review summary judgment rulings de novo. *Estate of Willson v. Addison*, 2011 MT 179, ¶ 11, 361 Mont. 269, 258 P.3d 410. We apply the same M. R. Civ. P. 56 criteria as the district court to determine "whether the moving party has established both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law." *Estate of Willson*, ¶ 11. The district court's conclusions of law are reviewed for

8

correctness, while findings of fact are reviewed to determine whether they are clearly erroneous. *Estate of Willson*, ¶ 11.

## DISCUSSION

¶23   *1. Did the District Court err in reopening discovery?*

¶24   Ann offers two arguments in support of her position that the District Court erred by extending discovery deadlines. First, Ann argues that the Hospital waived its right to an extension by failing to request an extension until after discovery had closed. However, the record demonstrates that Ann did not make this waiver argument in district court. "In Montana, the general rule is that an issue which is presented for the first time to the Supreme Court is untimely and cannot be considered on appeal." *Day v. Payne*, 280 Mont. 273, 276-77, 929 P.2d 864, 866 (1997). The rule is "rooted in fundamental fairness to the parties and to the trial court[.]" *Gary & Leo's v. Dept. of Lab. & Indus.*, 2012 MT 219, ¶ 16, ___ Mont. ___, ___ P.3d ___ (citing *Day*, 280 Mont. at 276-77, 929 P.2d at 866). The District Court was never presented with a waiver argument, and thus the argument must be denied as untimely.

¶25   Secondly, Ann argues the District Court erred by concluding the circumstances constituted "excusable neglect" justifying an extension of discovery. The Hospital counters that the appropriate standard  is not "excusable neglect," but rather, "good cause," and that under either standard the District Court acted properly within its broad discretion when it reopened discovery.

9

¶26 Discovery deadlines are governed by the Montana Rules of Civil Procedure. M. R. Civ. P. 16(b)(3)(A) provides that a scheduling order "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." The rule also states that a "schedule may be modified only for *good cause* and with the judge's consent." M. R. Civ. P. 16(b)(4) (emphasis added). M. R. Civ. P. 6(b) provides that a court may extend a deadline "after the time has expired if the party failed to act because of *excusable neglect*." (Emphasis added.) The parties argue over whether the "good cause" standard of M. R. Civ. P. 16(b)(4) or the "excusable neglect" standard of M. R. Civ. P. 6(b) applies to the modification of scheduling orders. There is a difference between the two standards, as "[g]ood cause is a more liberal standard than excusable neglect . . . ." *N.W. Truck & Trailer Sales, Inc. v. Dvorak*, 265 Mont. 327, 333, 877 P.2d 31, 34 (1994) (noting that "good cause" was used instead of "excusable neglect" in rule of appellate procedure to "provide greater flexibility to district courts in reviewing motions for extending time for filing a notice of appeal.").

¶27 Rule 16 applies to scheduling orders generally, and Rule 16(b)(4) provides the "good cause" standard for modification of scheduling orders. We have commonly applied this Rule in discovery deadline modification cases, even where discovery has closed. *See e.g. Lindey's, Inc. v. Prof. Consultants, Inc.*, 244 Mont. 238, 243, 797 P.2d 920, 923-24 (1990) (holding that the district court "did not err in finding there was not good cause to amend the scheduling order" after the original deadlines had already passed); *In re Marriage of Smith*, 270 Mont. 263, 270-71, 891 P.2d 522, 526-27 (1995)

10

(affirming district court ruling denying the extension of discovery beyond scheduling order deadline because the appellant failed to show "good cause" to modify the scheduling order); *Farmers Coop. Assn. v. Amsden, LLC*, 2007 MT 286, ¶ 22, 339 Mont. 445, 171 P.3d 690 (2007) (affirming district court's denial of plaintiff's motion to amend complaint after deadline set out in scheduling order for amendment had passed because plaintiff did not show "good cause" for delay). This precedent is consistent with federal court precedent.[3]

¶28　It appears that we have not previously considered the overlapping nature of the two rules, which both address extensions of time. Rule 6 provides an excusable neglect standard and conflicts with Rule 16, which provides a good cause standard. Rule 6 is a more general rule which governs the computation and extension of time for the rules, court orders, or statutes that do not specify a method of computing time. *See* M. R. Civ. P. 6(a). Rule 16 specifically governs scheduling orders that include discovery deadlines. *See* M. R. Civ. P. 16(b). "When a general statute and a specific statute are inconsistent, the specific statute governs, so that a specific legislative directive will control over an inconsistent general provision." *Mosley v. Am. Express Fin. Advisors, Inc.*, 2010 MT 78, ¶ 20, 356 Mont. 27, 230 P.3d 479 (citation omitted). The "good cause" standard found in

---

[3] *See Marcin Engg., LLC v. Founders at Grizzly Ranch, LLC*, 219 F.R.D. 516, 521 (D. Colo. 2003) ("In order for expert disclosures and related discovery to be reopened as Grizzly Ranch requests, Grizzly Ranch must show good cause to amend the discovery deadlines stated in the [scheduling order]."); *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 226 (D.C. Cir. 2011) (applying "good cause" standard to defendant's argument that the district court should have reopened expert disclosure deadlines). Fed. R. Civ. P. 16(b)(4) is identical to M. R. Civ. P. 16(b)(4).

M. R. Civ. P. 16(b)(4) is the appropriate standard for a district court to apply in determining whether to modify a scheduling order, even after deadlines have passed.

¶29 "Good cause is generally defined as a 'legally sufficient reason' and referred to as 'the burden placed on a litigant (usu. by court rule or order) to show why a request should be granted or an action excused.'" *City of Helena v. Roan*, 2010 MT 29, ¶ 13, 355 Mont. 172, 226 P.3d 601 (quoting *Black's Law Dictionary* 251 (Bryan A. Garner ed., 9th ed., West 2009)). We have stated that "good cause" is a flexible standard, and whether it is present "will necessarily depend upon the totality of the facts and circumstances of a particular case." *City of Helena*, ¶ 13. We conclude there was a "legally sufficient reason" for the District Court to modify the scheduling order. It found that both parties' conduct led to the passing of the discovery deadlines without necessary discovery being completed, and that a discovery standoff had occurred. Concluding that "[b]oth parties had a justifiable reason for their respective failures to comply," the District Court brought the dispute to a détente by reopening discovery so that Ann could receive a complete disclosure from the Hospital's expert and the Hospital could depose Ann's experts. This is the kind of "trial administration" matter that is within the proper "inherent discretionary power" of the district court. *Anderson*, ¶ 13. We conclude the District Court did not abuse its discretion in reopening discovery.

¶30 *2. Did the District Court err in granting summary judgment to the Hospital on Ann's agency claims?*

¶31 The District Court held that there was not an actual agency relationship between Dr. Mote and the Hospital because the undisputed facts established that Dr. Mote was not

12

actually employed by the Hospital at the time he treated Ann and Allen. As to ostensible agency, the District Court held that the undisputed facts established that the Hospital took no actions that would have led a reasonable person to believe Dr. Mote was its employee. The District Court reasoned that the Hospital went out of its way to inform the public that Dr. Mote was no longer employed by the Hospital. Ann argues these rulings were error because genuine issues of fact exist as to whether the Hospital severed its employment relationship with Dr. Mote following his return to Superior, and whether the Hospital's actions of allowing Dr. Mote to use its facilities would lead a person to believe Dr. Mote was a Hospital employee.

### A. Actual Agency

¶32 Montana statute provides that an "agency is actual when the agent is really employed by the principal." Section 28–10–101(1), MCA. "An individual is an employee of another when that other has the right to control the details, methods, or means of accomplishing the individual's work." *Butler v. Domin*, 2000 MT 312, ¶ 29, 302 Mont. 452, 15 P.3d 1189 (collecting Montana cases). We utilize four factors to determine whether a hospital has "right of control" over a doctor, so as to form an employment relationship: (1) direct evidence of right or exercise of control, (2) method of payment, (3) furnishing of equipment, and (4) right to fire. *Butler*, ¶ 29 (citation omitted). Our cases provide guidance on the issue of actual agency between a doctor and a hospital.

13

¶33 In *Kober v. Stewart*, 148 Mont. 117, 417 P.2d 476 (1966), we reversed summary judgment because genuine issues of material fact existed as to factors (1), (2), and (3). A patient sued a radiologist and Billings Deaconess Hospital after he broke his leg while getting X-rays. *Kober*, 148 Mont. at 118, 417 P.2d at 477. We noted a factual issue under factor (1) because the patient had not chosen the radiologist and the radiologist was working "on call" at the Hospital. *Kober*, 148 Mont. at 123, 417 P.2d at 479. As to factor (2), we noted that the X-ray department was owned and operated by the Hospital, which shared profits generated by the radiology department. *Kober*, 148 Mont. at 123, 417 P.2d at 479. As to factor (3), we noted that the Hospital employed all of the X-ray technicians and furnished the equipment. *Kober*, 148 Mont. at 123, 417 P.2d at 479.

¶34 Conversely, we upheld summary judgment in favor of the hospital in *Butler*. A patient sued two anesthesiologists and St. Patrick Hospital after he contracted an infectious disease in his spine while receiving steroid injections for back pain. *Butler*, ¶¶ 7-9. As in *Kober*, the patient in *Butler* did not choose his anesthesiologists, who were chosen by the Hospital. However, unlike the in-house, "on call" radiologist in *Kober*, the anesthesiologists did not have offices within the hospital, performed their own billing services, and did not share income with the Hospital. *Butler*, ¶ 31. We held that when "viewed in a light most favorable to [the patient]," the evidence failed to raise material issues of fact as to actual agency because under these facts it was not reasonable to infer that the "Hospital had the right to control or exercised control over the details, methods, or means of accomplishing [the anesthesiologists'] work." *Butler*, ¶ 32.

14

¶35 Here, the undisputed facts fall far short of establishing an employment relationship between Dr. Mote and the Hospital. Dr. Mote resigned his employment with the Hospital months before he started treating Ann. The Hospital did not rehire him upon his return to Superior. When he opened a home-office, Ann chose Dr. Mote to be her obstetrician, and saw him at his home-office for all prenatal visits. Ann never saw Dr. Mote at the Hospital prior to the delivery. Dr. Mote did not have office space at the Hospital, billed for his own services, and did not share any revenue with the Hospital. These undisputed facts do not raise a genuine issue as to whether the Hospital "had the right to control or exercised control over the details, methods, or means of accomplishing" Dr. Mote's work. *Butler*, ¶ 31. Summary judgment was appropriate.

**B.    Ostensible Agency**

¶36 An "ostensible agency" relationship arises "when the principal intentionally or by want of ordinary care causes a third person to believe another to be the principal's agent when that person is not really employed by the principal." Section 28-10-103(1), MCA. The acts of the principal, not the putative employee, are the focus of an ostensible agency inquiry. *Sunset Point Partn. v. Stuc-O-Flex Intl., Inc.*, 1998 MT 42, ¶ 22, 287 Mont. 388, 954 P.2d 1156. A patient's belief that her doctor is a hospital employee must be reasonable. *Sunset Point Partn.*, ¶¶ 23-24; *Butler*, ¶¶ 37, 39.

¶37 We have decided two cases involving claims of ostensible agency between a doctor and a hospital. In *Estates of Milliron v. Francke*, 243 Mont. 200, 203, 793 P.2d

15

824, 826-27 (1990), a patient claimed an ostensible agency between a radiologist and a hospital in Roundup because

> the hospital agreed to provide adequate space, equipment, and personnel for the radiology department; it sent and collected bills on behalf of the radiologist; and provided the radiologist with an office at the hospital. The radiologist had no separate office in Roundup, rather he privately consulted in hospitals and would travel around to those hospitals, including Roundup Memorial, performing work as a radiologist.

We held these facts were insufficient to raise a genuine issue as to ostensible agency because they did not establish that the Hospital had intentionally or by "want of ordinary care," § 28-10-103(1), MCA, led the patient to believe it had employed the radiologist. *Milliron*, 243 Mont. at 203, 793 P.2d at 827. We reasoned that "providing adequate space, equipment, and personnel is nothing more than what a hospital provides other doctors for the treatment of their patients." *Milliron*, 243 Mont. at 204, 793 P.2d at 827.

¶38 Conversely, in *Butler*, we held there were genuine issues of material fact as to ostensible agency between the anesthesiologists and the Hospital. We reasoned that, unlike *Milliron*, where the treating physician referred his patient to the radiologist, "Butler testified that neither he nor his treating physician chose either [anesthesiologist] for treatment. Both doctors were selected and scheduled by St. Patrick Hospital. . . . Butler also testified that upon arrival St. Patrick Hospital did not inform him that [the anesthesiologist] was an independent contractor." *Butler*, ¶ 37. We held that these facts were sufficient to raise a genuine issue as to "whether St. Patrick Hospital intentionally or negligently caused Butler to believe that [the anesthesiologist] was its agent." *Butler*, ¶ 43.

16

¶39 Here, we first note that, two weeks prior to her child's delivery, Ann signed a Hospital consent form acknowledging that she understood Dr. Mote was an "independent contractor" and not an employee or agent of the Hospital. She signed the form at the Hospital. Dr. Mote did not have an office at the Hospital, and the Hospital and Dr. Mote billed for their respective services separately. Unlike the patients in *Milliron* and *Butler*, Ann never saw Dr. Mote at the Hospital prior to Allen's birth. All of her appointments were at Dr. Mote's office. Given this record, the Hospital's provision of "space, equipment, and personnel" for the onetime event of Allen's delivery is insufficient to give rise to an ostensible agency. *Milliron*, 243 Mont. at 203, 793 P.2d at 827.

¶40 The Hospital did not do anything that would have led Ann to reasonably believe that it employed Dr. Mote. To the contrary, the Hospital took action to inform the public that Dr. Mote was not an employee of the Hospital. After Dr. Mote returned to Superior in the fall of 1992, the local paper carried a story stating that he would be opening his medical practice in the basement of his home. Madelyn Faller, then the Hospital's chief administrative officer, subsequently wrote a letter that was published in the local paper clarifying that Dr. Mote was not an employee of the Hospital: "Our hospital has not hired Dr. Mote for anything. Dr. Mote is in private practice in a location apart from the hospital and clinic. People who choose to go to him do so at their own will."

¶41 Summary judgment was appropriate because the undisputed facts show that the Hospital did not "intentionally or by want of ordinary care," § 28-10-103(1), MCA, cause Ann to reasonably believe that Dr. Mote was an employee of the Hospital.

17

¶42     *3. Did the District Court err in granting summary judgment to the Hospital on the joint venture claim?*

¶43     A joint venture is an "'association of two or more persons to carry on a single business enterprise for profit.'" *Sunbird Aviation, Inc. v. Anderson*, 200 Mont. 438, 444, 651 P.2d 622, 625 (1982) (quoting *Rae v. Cameron*, 112 Mont. 159, 167, 114 P.2d 1060, 1064 (1941)).  To qualify as joint venturers, two parties must have: (1) an express or implied agreement or contract creating a joint venture, (2) a common purpose among the parties, (3) community of interest, and (4) an equal right of control of the venture.  *Papp v. Rocky Mt. Oil & Minerals, Inc.*, 236 Mont. 330, 342, 769 P.2d 1249, 1257 (1989).  Because we conclude the fourth element is not met, we do not address the other elements.

¶44     Ann appears to define the "joint venture" as the mutually beneficial business relationship between Dr. Mote and the Hospital, wherein the Hospital granted Dr. Mote privileges to its facilities, and Dr. Mote used its facilities.  We reject this overly broad application of joint venture.  Assertion of a mutually beneficial relationship, without more, is insufficient to establish an "equal right and control" of a venture.  Undisputed facts show that Dr. Mote did not have an "equal right of control" of the Hospital policies or operation, and the Hospital did not have an "equal right of control" over Dr. Mote's treatment of his patients.  There was no agreement that Dr. Mote would send his patients to the Hospital—those decisions were made between Dr. Mote and his respective patients without input from the Hospital.  Ann has failed to raise a genuine issue of material fact as to the "equal right of control of the venture" factor of the joint venture test, and summary judgment was appropriate.  *Papp*, 236 Mont. at 342, 769 P.2d at 1257; *cf.*

18

*Barton v. Evanston Hosp.*, 513 N.E.2d 65, 67-68 (Ill. App. 1987) (affirming summary judgment on joint venture claim because the patient failed to specify how the hospital "controlled" the doctor's treatment of patients).

¶45    *4.  Did the District Court err in granting summary judgment to the Hospital on the Consumer Protection Act claim?*

¶46    The District Court granted summary judgment to the Hospital on Ann's Consumer Protection Act (CPA) claim, holding that Montana's CPA only applies to "business" or "entrepreneurial" actions of a health-care provider.  Ann appeals, arguing that nothing in the "plain language" of the CPA requires a hospital to be engaged in an "entrepreneurial aspect" of its business to be liable.

¶47    Montana's CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." Section 30-14-103, MCA (1991).[4] "Trade" and "commerce" are statutorily defined as

> the advertising, offering for sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state.

Section 30-14-102(8), MCA.

¶48    The first question presented is whether a claim under Montana's CPA may be brought against a hospital, an issue of first impression in Montana.  The relationship between consumer protection laws and the medical profession has been the subject of much discussion over the years.  Historically, the traditional "learned professions" of

---

[4] The 1991 version of the CPA applies because that version was in effect when the Hospital's allegedly deceptive or unfair practices occurred.

theology, law, and medicine, *St. Bar of Ariz. v. Ariz. Land Title & Trust Co.*, 366 P.2d 1, 6 (Ariz. 1961), were exempt from federal consumer protection laws under the reasoning that learned professions did not engage in "trade" or "commerce." *The Schooner Nymph*, 18 F. Cas. 506, 507 (C.C.D. Me. 1834) (Story, J.); *A. Cleaners & Dyers v. U.S.*, 286 U.S. 427, 435-36 (1932). "The distinction was said to be that, in contrast to practicing a trade or running a business, 'competition is inconsistent with the practice of a profession because enhancing profit is not the goal of professional activities; the goal is to provide services necessary to the community.'" *Nelson v. Ho*, 564 N.W.2d 482, 484 (Mich. App. 1997) (quoting *Goldfarb v. Va. St. Bar*, 421 U.S. 773, 786 (1975)).

¶49    In *Goldfarb*, the United States Supreme Court abolished this blanket immunity, holding that a minimum-fee schedule imposed by the Virginia State Bar constituted a "classic illustration of price fixing" in violation of § 1 of the Sherman Act. *Goldfarb*, 421 U.S. at 775, 783. In rejecting the Virginia State Bar's argument that lawyers did not engage in "trade or commerce," the Supreme Court recognized that the modern legal practice had "business aspect[s]" that fell outside the historical practice of the "learned professions." *Goldfarb*, 421 U.S. at 788. The Court was careful, however, to acknowledge that "professions" are not synonymous with "businesses" for *all* purposes under antitrust and consumer protection laws:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas.

20

*Goldfarb*, 421 U.S. at 788 n. 17. The Court held that when a "learned profession" ventures into a "business" role as opposed to its "professional" role, it is subject to the same antitrust and consumer protection laws as any other business. *Goldfarb*'s rubric left to other courts the task of delineating what were "professional aspects" and what were "business aspects" of the "learned professions."

¶50     A seminal case in this regard was decided by the Washington Supreme Court. *See Short v. Demopolis*, 691 P.2d 163 (Wash. 1984). The court echoed *Goldfarb* by concluding that while it would be improper to wholly exempt "learned professionals" from consumer protection laws, some conduct would remain exempt:

> It would be a dangerous form of elitism, indeed, to dole out exemptions to our antitrust laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare. Clearly, the more appropriate and fairer course is to examine the nature and conduct involved in the profession on a case by case basis together with the context in which it is practiced.

*Short*, 691 P.2d at 167 (quoting *U.S. v. Natl. Socy. of Prof. Engg.*, 389 F. Supp. 1193, 1198 (D.D.C. 1974)). The court surveyed and distilled federal and state cases into its holding that "certain entrepreneurial aspects of the practice of law may fall within the 'trade or commerce' definition of the CPA." *Short*, 691 P.2d at 168.

¶51     The *Short* court's "entrepreneurial aspect rule" was illustrated by its application to the plaintiff's claims in that case. As to the first claim—a challenge to "how the price of legal services is determined, billed, and collected"—the court held these were "entrepreneurial aspects" of running a law firm and therefore actionable. *Short*, 691 P.2d

21

at 168. As to the second and third claims—challenges based upon a lawyer's allegedly sub-par work—the court held the claims were "not chiefly concerned with the entrepreneurial aspects of legal practice; rather, they concern the actual practice of law." *Short*, 691 P.2d at 168. Because these claims were directed at the "competence of and strategy" of the plaintiff's lawyers, the lawyer's conduct fell under the "professional aspect" of the practice of law and were exempt from Washington's CPA. *Short*, 691 P.2d at 168.

¶52    The Washington Court of Appeals extended *Short* to the practice of medicine. *See Quimby v. Fine*, 724 P.2d 403, 406 (Wash. App. 1986). Then, in a case with facts similar to the present case, the Washington Court of Appeals extended *Short* and *Quimby* to hospitals. *Jaramillo v. Morris*, 750 P.2d 1301, 1304 (Wash. App. 1988). The plaintiff in *Jaramillo* sued her doctor and the hospital for injuries sustained during an ankle surgery. *Jaramillo*, 750 P.2d at 1302-03. The plaintiff alleged the hospital was negligent by "not determining Dr. Morris' qualifications to perform ankle surgery, and, if the ankle surgery [was] not within his podiatry license, negligence in not determining that fact." *Jaramillo*, 750 P.2d at 1304. Because the "entrepreneurial aspects of the hospital's business, such as billing, were not implicated . . ." by this negligence claim, the court held that the claims were not actionable under the CPA. *Jaramillo*, 750 P.2d at 1304.

¶53    Other courts have followed Washington's lead and applied the "entrepreneurial aspect test," or a similar version thereof, to CPA claims brought against doctors and hospitals. *See e.g. Haynes v. Yale-New Haven Hosp.*, 699 A.2d 964, 974 (Conn. 1997)

(concluding that "the touchstone for a legally sufficient [consumer protection act] claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services aside from medical competence is implicated, or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel."); *Nelson*, 564 N.W.2d at 486 (Mich. App. 1997) (holding that only acts, or practices "in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under [Michigan's consumer protection act]."); *Dorn v. McTigue*, 157 F. Supp. 2d 37, 48-49 (D.D.C. 2001) (granting summary judgment to doctor on consumer protection claim because the plaintiff "failed to make a showing sufficient to establish the [doctor's] alleged statement was motivated by entrepreneurial motives."); *Simmons v. Stephenson*, 84 S.W.3d 926, 928 (Ky. App. 2002) (affirming summary judgment to doctor on consumer protection claim because the "allegations in the complaint did not relate to the entrepreneurial, commercial, or business aspect of Dr. Stephenson's practice of medicine.").[5]

¶54     We agree with the courts that have reasoned that exempting hospitals entirely from consumer protection laws would be an improper "form of elitism[.]" *Short*, 691 P.2d at 167.  A wholesale exemption would be inconsistent with the definitions of "trade" and "commerce" in § 30-14-102(8), MCA.  We also agree with the near unanimous line of

---

[5] *But see Crowe v. Tull*, 126 P.3d 196, 205 (Colo. 2006) ("We are convinced by our reading of the [Colorado Consumer Protection Act] that a judicially forged distinction between the professional and entrepreneurial activities of attorneys, exempting the 'actual practice' of law from [Colorado Consumer Protection Act] liability, is not the proper vehicle for analyzing a deceptive trade practice claim against a lawyer.").

23

authority that has exempted from the CPA conduct by health-care providers in the "actual practice" of the profession. These professions are liable under Montana's consumer protection laws only for activities related to the "entrepreneurial, commercial, or business" aspects of their practices. As the Michigan Court of Appeals reasoned in *Nelson*, 564 N.W.2d at 486, failing to exempt professional negligence in the course of the "actual practice" of medicine could render medical malpractice law "obsolete":

> We do not consider the Legislature's use of "trade or commerce" in defining the application of the act to exhibit an intent to include the actual performance of medical services or the actual practice of medicine. If we were to interpret the act as such, the legislative enactments and well-developed body of law concerning medical malpractice would become obsolete. While we are aware of the expense and difficulty in maintaining a medical malpractice action, we do not think [Michigan's Consumer Protection Act] was meant by the Legislature to be an alternative to its specific statutory scheme addressing medical malpractice claims.

This reasoning is especially persuasive given that we are herein recognizing the tort of negligent credentialing—a form of professional negligence. Therefore, we hold that only those acts or practices in the conduct of the entrepreneurial, commercial, or business aspects of running a hospital are actionable under Montana's CPA.

¶55 Ann's claim against the Hospital is not actionable under Montana's CPA. Her claim implicates the Hospital's failure to properly vet Dr. Mote before credentialing him to use its facilities. The process undertaken by a hospital to determine if a doctor is medically qualified to use its facilities implicates the "actual practice" of medicine. If the Hospital failed to properly vet Dr. Mote prior to granting privileges, it is subject to negligent credentialing liability, a form of professional negligence. Credentialing a

24

doctor is not an entrepreneurial, commercial, or business aspect of providing healthcare, such as the practice of billing patients, advertising, etc. *Jaramillo*, 750 P.2d at 1304. The District Court properly granted summary judgment to the Hospital on Ann's CPA claim.

¶56     5. *Did the District Court err in granting summary judgment to the Hospital on the negligent credentialing claim?*

¶57     Ann explains that "negligent credentialing is a legal theory of first impression in Montana." The District Court noted that Montana has not specifically adopted "negligent credentialing" as a cause of action, and we first undertake that question. This Court has the power to recognize and abolish common-law doctrines and to define any accompanying defenses. *See e.g. Sacco v. High Country Indep. Press, Inc.*, 271 Mont. 209, 896 P.2d 411 (1995) (recognizing negligent infliction of emotional distress and intentional infliction of emotional distress as independent causes of action under the common law); *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 33-34, 776 P.2d 488, 494-95 (1989). When asked to recognize a new cause of action, the Court will review "our own caselaw and the authorities from other jurisdictions" to determine if the "gradual evolution" of the common law supports recognition of the new claim. *Sacco*, 271 Mont. at 220, 234, 896 P.2d at 418, 426.

¶58     While we have not formally recognized the tort of "negligent credentialing," we foreshadowed its adoption 40 years ago. In *Hull v. North Valley Hosp.*, 159 Mont. 375, 498 P.2d 136 (1972), the plaintiff sought treatment from a doctor who misdiagnosed and mistreated a "general infection" of his knee, exacerbating the plaintiff's original injury. *Hull*, 159 Mont. at 379-81, 498 P.2d at 138-39. The plaintiff sued the hospital for

25

negligence in "permitting Dr. Kauffman to use its facilities in ministering to his patients in light of his previous record." *Hull*, 159 Mont. at 382, 498 P.2d at 140. We did not reach the negligent credentialing issue because we held that the hospital was not liable because there was no reason for the hospital to have restricted Dr. Kauffman's license prior to the botched surgery—e.g., he did not have a history of malpractice. *Hull*, 159 Mont. at 389-90, 498 P.2d at 143-44. However, in doing so, we acknowledged that the rise of the "modern hospital" imposed a duty on hospitals to take steps to ensure patient safety in the process of accreditation and granting of privileges:

> [T]he integration of a modern hospital becomes readily apparent as the various boards, reviewing committees, and designation of privileges are found to rest on a structure designed to control, supervise, and review the work within the hospital. The standards of hospital accreditation, the state licensing regulations, and the [hospital's] bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient.

*Hull*, 159 Mont. at 389, 498 P.2d at 143. This reasoning is even more persuasive 40 years later, with the development of hospitals into "comprehensive health care" facilities. *Butler*, ¶ 41 (citation omitted).

¶59 We have recognized analogous torts. Negligent selection/hiring of an independent contractor, for example, has long been recognized by this Court. *See Gurnsey v. Conklin Co.*, 230 Mont. 42, 53-54, 751 P.2d 151, 157-58 (1988) (adopting *Restatement (Second) of Torts* § 411). Numerous jurisdictions have adopted the tort of negligent credentialing against hospitals. As the Minnesota Supreme Court recently noted when adopting the tort, "negligent credentialing is recognized as a common law tort by a substantial

26

majority of the other common law states." *Larson v. Wasemiller*, 738 N.W.2d 300, 309 (Minn. 2007). By our count, at least 30 states currently recognize the tort of negligent credentialing.[6] In 2010, the Supreme Court of Utah succinctly explained this widespread acceptance of negligent credentialing as a claim: "[N]egligent credentialing is simply the application of broad common law principles of negligence, and is a natural extension of torts such as negligent hiring." *Archuleta v. St. Mark's Hosp.*, 238 P.3d 1044, 1049 (internal quotation marks and citations omitted). The tort "is inherent in and the natural extension of well-established common law rights." *Larson*, 738 N.W.2d at 306.

¶60 Based on these authorities, we are persuaded that the "gradual evolution" of the common law supports the recognition of the tort of negligent credentialing. *Sacco*, 271 Mont. at 234, 896 P.2d at 426. We therefore recognize negligent credentialing as a valid

---

[6] *See Humana Med. Corp. of Ala. v. Traffanstedt*, 597 So.2d 667, 668-69 (Ala. 1992); *Fletcher v. S. Peninsula Hosp.*, 71 P.3d 833, 842 (Alaska 2003); *Tucson Med. Ctr., Inc., v. Misevch*, 545 P.2d 958, 960 (Ariz. 1976); *Elam v. College Park Hosp.*, 132 Cal. App. 3d 332, 183 Cal. Rptr. 156, 160 (1982); *Kitto v. Gilbert*, 570 P.2d 544, 550 (Colo. 1977); *Insinga v. LaBella*, 543 So.2d 209, 214 (Fla. 1989); *Mitchell Co. Hosp. Auth. v. Joiner*, 189 S.E.2d 412, 414 (Ga. 1972); *Domingo v. Doe*, 985 F. Supp. 1241, 1244-45 (D. Haw. 1997); *May v. Wood River Twp. Hosp.*, 257, 629 N.E.2d 170, 171 (Ill. 1994); *Winona Meml. Hosp., Ltd. P'ship v. Kuester*, 737 N.E.2d 824, 828 (Ind. Ct. App. 2000); *Baublitz v. Penn. Regl. Med. Ctr.*, 2010 WL 3199343, *6 (D. Md. August 12, 2010); *Ferguson v. Gonyaw*, 236 N.W.2d 543, 550 (Mich. 1975); *Larson v. Wasemiller*, 738 N.W.2d 300, 313 (Minn. 2007); *Taylor v. Singing River Hosp. Sys.*, 704 So.2d 75, 78 n. 3 (Miss. 1997); *Corleto v. Shore Meml. Hosp.*, 350 A.2d 534, 537-38 (N.J. 1975); *Diaz v. Feil*, 881 P.2d 745, 749 (N.M. 1994); *Sledziewski v. Cioffi*, 137 A.D.2d 186, (N.Y. App. Div. 1988); *Blanton v. Moses H. Cone Meml. Hosp., Inc.*, 354 S.E.2d 455, 458 (N.C. 1987); *Albain v. Flower Hosp.*, 553 N.E.2d 1038, 1045 (Ohio 1990); *Strubhart v. Perry Meml. Hosp. Trust Auth.*, 903 P.2d 263, 276 (Okla.1995); *Welsh v. Bulger*, 698 A.2d 581, 586 (Pa. 1997); *Rodrigues v. Miriam Hosp.*, 623 A.2d 456, 462-63 (R.I. 1993); *Crumley v. Meml. Hosp., Inc.*, 509 F. Supp. 531, 535 (E.D. Tenn. 1978); *Archuleta v. St. Mark's Hosp.*, 238 P.3d 1044, 1048-49 (Ut. 2010); *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 545-46 (Tex. 2004); *Wheeler v. Cent. Vt. Med. Ctr. Inc.*, 582 A.2d 165, 166 (Vt. 1989); *Pedroza v. Bryant*, 677 P.2d 166, 168-70 (Wash. 1984); *Roberts v. Stevens Clinic Hosp., Inc.*, 345 S.E.2d 791, 798 (W. Va. 1986); *Johnson v. Misericordia Cmty. Hosp.*, 301 N.W.2d 156, 164 (Wisc. 1981); *Greenwood v. Wierdsma*, 741 P.2d 1079, 1088 (Wyo. 1987).

27

cause of action in Montana. Similar to a medical malpractice claim, a plaintiff in a negligent credentialing action must establish the following elements: "(1) the applicable standard of care, (2) the defendant departed from that standard of care, and (3) the departure proximately caused plaintiff's injury." *Estate of Willson*, ¶ 17.

¶61 The second issue is whether expert testimony is necessary to support a claim for negligent credentialing, and, if so, what testimony is sufficient to raise a genuine issue as to liability. The District Court ruled that expert testimony was required. Ann argues that expert testimony is not necessary because the Hospital's "credentialing decision is not beyond the understanding of a jury." The Hospital counters that the determination that a physician was "medically unqualified" is not an ordinary negligence inquiry, arguing the evidentiary burden is no different than in medical malpractice claims and expert testimony is required.

¶62 It has been noted that "[a]ll courts that have looked at the question have concluded that expert testimony is necessary to establish the standard of care owed by a hospital, or whether the hospital has been negligent." Benjamin J. Vernia, *Tort Claim for Negligent Credentialing of Physician*, 98 A.L.R. 5th 533, 553 (2002) (internal citation omitted). The courts that have already addressed this question have reasoned that the process through which a hospital credentials a doctor to use its facilities is outside the knowledge of a common person. *See e.g. Johnson v. Misericordia Cmty. Hosp.*, 301 N.W.2d 156, 172 (Wisc. 1981) ("[S]ince the procedures ordinarily employed by hospitals in evaluating applications for staff privileges are not within the realm of the ordinary experience of

28

mankind . . . expert testimony was required to prove the same."); *Neff v. Johnson Meml. Hosp.*, 889 A.2d 921, 928 (Conn. App. 2006) ("we hold that the parameters of a hospital's judgment in credentialing its medical staff is not within the grasp of ordinary jurors.").

¶63    Under Montana law, expert testimony is required to establish the standard of care "unless the conduct complained of is readily ascertainable by a layman." *Mont. Deaconess Hosp. v. Gratton*, 169 Mont. 185, 189, 545 P.2d 670, 672 (1976); *Dalton v. Kalispell Regl. Hosp.*, 256 Mont. 243, 246, 846 P.2d 960, 962-63 (1993). We have reasoned that because "juries composed of laymen are normally incompetent to pass judgment" on questions of whether "reasonable care" was exercised in undertaking "work calling for a special skill[,]" there can be "no finding of negligence in the absence of expert testimony to support it." *Carlson v. Morton*, 229 Mont. 234, 239, 745 P.2d 1133, 1137 (1987) (quoting Prosser and Keeton, *The Law of Torts*, § 32 (West 5th ed., 1984)). We agree with other courts that the process of physician credentialing can be complicated and that the "reasonable care" a hospital must undertake in credentialing a doctor is not "readily ascertainable by a layman." *Gratton*, 169 Mont. at 189, 545 P.2d at 672. This is particularly true in a case like this one, where a physician seeks credentials after being convicted of a crime. Therefore, we affirm the District Court's determination that expert testimony is required to establish the applicable standard of care in a negligent credentialing claim and a deviation from that standard of care.

29

¶64   The District Court granted summary judgment to the Hospital on Ann's negligent credentialing claim on an issue of expert testimony.  It concluded that, while Ann provided expert testimony as to the *standard of care* applicable the Hospital's decision to credential Dr. Mote, she failed to provide expert testimony that the Hospital *breached* that standard of care.  Ann argues that the District Court erred because her expert, Dr. Boatman, and the Hospital's former chief administrative officer, Madelyn Faller, both provided testimony that established the Hospital deviated from reasonable care in credentialing Dr. Mote.  The Hospital counters that Ann failed to establish breach because her expert never came to the conclusion that the Hospital breached the standard of care.  According to the Hospital, Madelyn Faller's testimony likewise is insufficient because her testimony that there were "red flags" in Dr. Mote's application was not itself sufficient to establish that the Hospital deviated from the standard of care.

¶65   It is "well settled Montana law" that to survive a motion for summary judgment, a plaintiff in a medical malpractice action must provide expert testimony that establishes: "(1) the applicable standard of care, (2) the defendant departed from that standard of care, and (3) the departure proximately caused the plaintiff's injury."  *Estate of Willson*, ¶ 17; *accord Gratton*, 169 Mont. at 189, 545 P.2d at 672; *Baylor v. Jacobson*, 170 Mont. 234, 240, 552 P.2d 55, 58 (1976); *Falcon v. Cheung*, 257 Mont. 296, 303, 848 P.2d 1050, 1055 (1993); *Estate of Nielsen v. Pardis*, 265 Mont. 470, 473, 878 P.2d 234, 235-36 (1994); *Beehler v. E. Radiological Assocs., P.C.*, 2012 MT 260, ¶ 21, ___ Mont. ___, ___ P.3d ___.  "Without expert testimony to establish these elements, no genuine issue of

material fact exists and the defendant is entitled to judgment as a matter of law." *Estate of Willson*, ¶ 17. These standards likewise apply to the similar claim of negligent credentialing.

¶66 The District Court correctly noted that "Dr. Boatman's expert disclosure is his expert testimony." During his deposition, Dr. Boatman agreed with counsel for the Hospital that his expert disclosure contained "all of the opinions" he was "offering in this case." When asked again whether he had revised any of the opinions since preparing his disclosure, Dr. Boatman answered "no." With regard to the Hospital's breach of standard of care, Dr. Boatman's expert disclosure provided:

> My understanding is that Dr. Mote had been convicted of a sexual offense committed upon a minor, had DEA license restrictions and had a history of malpractice. Assuming one or more of these "red flags" to be the case, failure to request a list of privileges granted to him by other hospitals or to insist on evidence of training of changes in behavior is a violation of the standard of care for hospitals. *Without a copy of the hospital governing bylaws, medical staff bylaws and the credentials file for Dr. Mote, however, I cannot render an opinion about the medical staff privileges granted as a violation of the standard of care for hospitals.*

(Emphasis added.) This statement does not constitute an opinion that the Hospital deviated from the applicable standard of care. Rather, it states that at the time of his disclosure, Dr. Boatman had not been provided with adequate information to offer an opinion as to whether the Hospital had breached its duty. Dr. Boatman's disclosure was insufficient to state that a breach of the standard of care had occurred, as we have held is necessary. *Falcon*, 257 Mont. at 304, 848 P.2d at 1055 (plaintiff's medical expert hypothesizing as to why the decedent was not transferred to a larger facility "more

31

promptly" failed to establish deviation from standard of care because "not knowing of the overall hospital situation, he merely raised the question *to further explore* whether or not a delay in transferring the patient was an issue.") (emphasis added); *Gratton*, 169 Mont. at 189-90, 545 P.2d at 672-73 (affirming summary judgment because the "testimony elicited from Drs. Wolgamot and Graham as to their treatment of Gratton as well as their past experience with infections has not established a standard of medical care or a deviation therefrom. A defendant doctor's testimony as to his usual personal practice is not sufficient to establish a general medical standard of care. Also, the personal and individual method of practice of the defendant doctor is not sufficient to establish a basis for an inference that he has negligently departed from the general medical custom and practice of his community."); *Estate of Willson*, ¶ 17 (noting that without expert testimony to establish applicable standard of care, deviation from standard of care, and proximate cause "no genuine issue of material fact exists and the defendant is entitled to judgment as a matter of law."); *Beehler*, ¶ 21 (noting that "plaintiff's failure to provide this expert testimony is fatal to the plaintiff's claim.") (citation and quotation marks omitted); *Griffin v. Moseley*, 2010 MT 132, ¶ 31, 356 Mont. 393, 234 P.3d 869 (same); *Estate of Nielsen*, 265 Mont. at 473, 878 P.2d at 236 (affirming summary judgment because plaintiff failed to "affirmatively produc[e]" evidence that the defendant "breached a duty of care.").

¶67    For whatever reason, Dr. Boatman's disclosure was never supplemented and he apparently was not provided the additional information needed to revise his opinion by

32

the time of his deposition, over two-and-a-half years later. There was clearly enough time to address the insufficiency in Dr. Boatman's disclosure yet, at his deposition, Dr. Boatman testified that nothing had changed from that report. In the end, he never offered an opinion that the Hospital had breached the applicable standard of care.

¶68 Ann's assertion that Madelyn Faller's deposition testimony establishes breach of the standard of care similarly fails. During Faller's deposition, the following colloquy took place regarding the Hospital's vetting of doctors before granting privileges:

> **Ann's counsel**: Do you know does the medical staff have an obligation, as part of assessing credentials and quality, to ensure quality is brought into the community? Do they have an obligation to determine the malpractice history of a physician who is applying for staff privileges?
>
> **Faller**: The chairman of the medical staff *perhaps* has an obligation.

(Emphasis added.) Even assuming that Faller was qualified to offer an expert opinion, her equivocal testimony does not clearly establish the standard of care and a deviation by the Hospital. It merely establishes that Faller was not certain of the standard, but that it was possible that the medical staff had an obligation they did not fulfill. Ann directs us to other statements by Faller that are equally insufficient.

¶69 We decline to deviate from our well settled precedent and the sound policy underlying it. As we have emphasized, "full disclosure during discovery under Rule 26, M.R.Civ.P., is designed to 'eliminate surprise and to promote effective cross-examination of expert witnesses.'" *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 11, 316 Mont. 469, 74 P.3d 1021 (quoting *Hawkins v. Harney*, 2003 MT 58, ¶ 21, 314 Mont. 384, 66 P.3d 305). The plaintiff in a negligent credentialing claim must present expert

33

testimony establishing that the defendant deviated from the applicable standard of care to raise a genuine issue of material fact. Because Ann did not do so in this case, the District Court was correct to grant summary judgment to the Hospital.

¶70 We affirm the District Court on all issues raised on appeal.


                                        /S/ JIM RICE


We concur:


/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS